THE STATE OF MONTANA, STATE HIGHWAY COMMIS-
SION OF THE STATE OF MONTANA, AND HARRY L. BURNS,
L. V. SWANSON, OTIS S. WATERS, S. N. HALVORSON,
AND ROY L. SORRELLS, AS MEMBERS OF AND CONSTITUTING
THE STATE HIGHWAY COMMISSION OF THE STATE OF MONTANA,
PLAINTIFFS AND APPELLANTS, v. ALMA E. SMITH, MARY
P. JESSON, JOHN M. JESSON, KANSAS CITY LIFE INSUR-
ANCE COMPANY, A MISSOURI CORPORATION, AND WILBUR E.
SMITH, DEFENDANTS AND RESPONDENTS.

No. 10378
Submitted September 7, 1962. Decided December 28, 1962.
377 P.2d 352

Forrest H. Anderson, Atty. Gen., Daniel J. Sullivan (argued orally), Helena, for appellants.

Earl C. Ammerman, Fitzgerald & Shanstrom, David B. Fitzgerald (argued orally), Jack D. Shanstrom (argued orally), Livingston, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment for defendants rendered pursuant to a verdict in the district court of Park County. The action is in eminent domain. It was tried in district court after an appeal pursuant to statute by the defendants from an award of commissioners appointed to assess damages to be paid the defendant as compensation for their property appropriated for the construction of a controlled access Interstate Highway.

The property, which is farm land, is about two miles west of Livingston, Montana. The condemned portion of 22.7 acres is situated so that the taking divided the farm into parts. The entire farm in two parts consisted of about 1,500 acres. It was described as a balanced unit for dairy purposes; balanced meaning that there was pasture, dry, and irrigated, and in addition adequate night pasture, plus hayland sufficient for winter purposes. In addition to thirty head of milch cows, dry cows and a small beef herd were run. A section, 640 acres of land was about two miles away, but 900 acres of land was in one unit. The condemned portion segregated about 58 acres, including the night dairy pasture and the 22.7 acres actually

taken, leaving 840 acres untouched, plus the 640 acre section of pasture.

The Commissioners' award was in the sum of $3,719 for the land taken and $17,518 for severance damages for a total of $21,237.

The jury verdict was in the sum of $6,810 for the land taken and $37,500 for severance damages for a total of $44,310. This appeal followed.

The specifications of error are as follows:

(1) The court erred in overruling the motion to strike the testimony of the witness, John Jesson.

(2) The court erred in overruling the motion to strike the testimony of the witness, Paul Working.

(3) The evidence is insufficient and incompetent to justify the verdict of the jury.

(4) The court erred in allowing the witness, John Jesson, to testify as to his ownership and in not requiring that he produce the best evidence as to his title.

The first three specifications of error all go to testimony of the only two witnesses for the landowner who expressed opinions as to value.

The first witness, John Jesson, one of defendants whom we shall call the landowner, testified that he and his family lived on the farm through which the right of way was being condemned; that he was operating a dairy; that he was purchasing the farm from his mother and aunt on a contract for deed; that he milked thirty cows on an average, marketed his milk to one buyer. He explained his dairy operation and how the new highway would affect it, generally it would destroy his night pasture, cause him to have to reduce his herd or buy hay, cause him considerable increase in cost of operation because of increased travel to and from the segregated part and other matters. He said he would have to reduce his milking herd from thirty to fifteen cows. He described the lands taken. Then he was asked:

"Q. Well, taking all these factors into consideration, Mr. Jesson, what do you feel it would take to make you whole; in other words, what do you estimate, in your opinion, what is the damages that you have sustained by the highway taking this land and the damages to the remainder? A. Well, I figure all together about $60,000.'

On cross-examination by the State, this exchange:

"Q. And I believe you told the jury that you placed a value of damages of something like $60,000? A. Yes.

"Q. Would you explain to the jury—First of all, may I ask you this question. Do you base this estimate that you have given as your opinion, is this based on your loss of income then that would arise from the taking of this land? A. Loss of income and loss of my night pasture.

"MR. TUCKER: Your Honor, we would ask that the testimony of this witness be stricken and the jury admonished to ignore it because it is based on loss of income and loss of income is not a compensable item in this case."

This same type of questioning and responses went on, with it being made obvious that the owner was basing his $60,000 damage estimate on what he figured was the loss of part of his dairy operation. Just how he arrived at his figure was never fully explained.

At another point:

"Q. In effect then I said you did not reach your estimate of damages which you gave to the jury on what you consider market value of the land? A. Well, I don't want to sell it.

"Q. I know that. You didn't base your opinion on the market value of the land then, did you? A. I based it on damages.

"Q. And would you tell us then are these damages based on what you consider profits from your business to be made from that ranch? * * * A. Well, yes.

"Q. And to follow that up then, Mr. Jesson, did you ever try to determine the value of your ranch? A. You mean if I wanted to sell it the way it was set before July the 1st?

"Q. Yes, if I may clarify it. If you were to try to sell it what do you think you could get for it, the value you place on the ranch? A. $175,000."

We shall refer back to Mr. Jesson's testimony later. The next witness for the owner was Paul Working. After stating his qualifications as a real estate broker and familiarity with the property, Mr. Working testified in part:

"Q. Now Mr. Working, what methods do you use in arriving at an appraisal? When you go out to appraise a piece of property what are the general methods that you take into consideration? A. There are three general methods that I use. One is estimating the value through comparable properties which have been sold. Another is to estimate replacement cost; and a third is by the income a property will produce.

"Q. Did you consider these methods on the Smith-Jesson property? A. I did.

"Q. And what method did you use in arriving at your appraisal? A. I used the income method.

"Q. Why did you use that method? A. It seemed to me best to reflect the damage to the Smith-Jesson property as an operating dairy ranch.

"Q. And as an appraiser appraising the property then you —How did you arrive or did you place a monetary damage upon the property after the highway goes through the Smith and Jesson property? A. I did.

"Q. And would you state to the members of the jury here the method that you used? A. Well, I used two variations on an income method. The simplest was to find the loss and added cost of operating that ranch with the same dairy herd after the highway had gone through."

Then Working explained his computation. He found a loss of seventeen gallons of milk per day at 38 cents per gallon for four months because of loss of pasture. This figure was $775.20. Then he found a loss of 43 tons of hay at a price of

$25 per ton for an annual loss of $1,075 per year. Then he added a cost of extra labor required for irrigating, moving machinery, etc, of $300. So he computed the total of $2,150.20 as Jesson's reduced annual income. This figure was based on the same average thirty cow herd that milked before the taking.

Then Working explained another computation based on the same general method. In this computation he decreased the herd from thirty to eighteen milking cows and added some beef cattle in what he described as a balanced unit, that is, a unit that would balance summer pasture with winter feed.

In each of the computations he testified:

"Q. Then by using this loss of income what figure do you arrive at for the total damages to the Smith and Jesson property, that is total, in your opinion what would be the just compensation to make the defendant whole? A. May I explain how I arrive at that?

"Q. Yes. A. I capitalized that, which means trying to find the *sum of money which invested at a certain per cent would bring Mr. Jesson that income.* And I used the percentage of 5½ percent and capitalized in that fashion, and I come up with $39,090.

"Q. And in your opinion that is the amount of compensation that it would take to make the defendant whole after the taking of the land by the Highway Department? A. That is correct."

So, by one computation he arrived at a figure of $39,090 and by the other $39,571. In each computation he did not use any cost of production against the so-called "loss of income," in applying a capitalization rate of 5½ percent. On cross-examination Working explained:

"Q. Now this capitalized figure, I wonder if you would explain to the jury just what you mean by capitalizing that? A. The simplest explanation, which I think I gave the jury previously, Mr. Jesson has suffered a loss of $2,150. What sum

would you have to find for Mr. Jesson to assure him of an income of $2,150.20 a year at 5½ percent? To do that you multiply that loss by 18.18, and the figure is $39,090.

"Q. Well is that a capitalization figure or an interest figure? A. That is—can be considered either.

"Q. In your estimation either one or the other wouldn't make any difference? A. Not a great deal of difference, no. On ranch properties you generally capitalize at *the going interest rate for ranch loans*. Business properties are capitalized at different rates according to the risks involved, the management required, and that type of thing, so you would apply to a business a different capitalization rate than you would to a ranch."

The foregoing testimony of Jesson and Working is the only testimony on value produced by the owner. Motions to strike were made as to each. That speculative and conjectural evidence cannot be the basis for a determination of fair market value has been consistently held by this court. State Highway Comm. v. Bradshaw Land & Livestock Co., 99 Mont. 95, 43 P.2d 674; State Highway Comm. v. Hoblitt, 87 Mont. 403, 288 P. 181; Lewis & Clark County v. Nett, 81 Mont. 261, 263 P. 418.

We have also held in Yellowstone Park R. R. Co. v. Bridger Coal Co., 34 Mont. 545, 558, 87 P. 963, 966, that "The right mode of proving value is to take the sworn opinions of those who are shown to be competent to give opinions on the subject, and let them be cross-examined as to the foundation of their opinions, their means of knowledge and the motives prompting them."

But, this statement does not mean that when it is developed that the opinion itself is based upon speculative and conjectural evidence that it should not be, upon proper objection, stricken. Obviously this must be so. Respondent here quotes Chief Justice Brantly in the same case, Yellowstone Park R. R. Co., supra, at page 562, 87 P. at page 968:

"It is said that the evidence is not sufficient to sustain the verdict. It would be a bootless task to take up and analyze the evidence and undertake to reconcile the statements of the various witnesses. Most of them were practical farmers and businessmen who knew the lands in controversy, and, while their statements are conflicting and unsatisfactory upon material point, we cannot say that the evidence all together does not give substantial support to the findings of the jury. That this court must, under these circumstances, accept them as final is too well-settled to permit further discussion."

 This was correct in that case, but here we have the landowner and the expert appraiser as the only witnesses establishing value. We have examined and analyzed the expert's testimony and shown it to be based upon such an erroneous application of an appraisal method as to amount to speculation and conjecture. For a further discussion of the so-called "capitalization of income method," see our discussion in State Highway Comm'n v. Bare, 141 Mont. 288, 377 P.2d 357, filed this same date.

We hold that the failure to strike the testimony of the expert was error. It is suggested by the respondent that in any event, even without the expert's testimony as to value which was less than the jury award, the testimony of the owner, standing alone, is sufficient to sustain the verdict. To reach this argument, the respondent would have to say that the expert's testimony, while erroneous, was not prejudicial.

The respondent would argue this, particularly where, as here, a view of the premises was had.

After the owner rested, the State put on but one witness as to value, an outside appraiser. The details of his testimony are not important here. Suffice to say it should not have been surprising to the State that his testimony, standing alone, was not of much weight. However, it is noteworthy that he, too, used a capitalization of income approach. However, he used it on capital only, that is, as if income were being invested as

an investment without labor involved. For discussion see State Highway Comm'n v. Bare, previously referred to.

The state then asked for a view of the premises which was had. In State Highway Comm'n v. Anderson, 92 Mont. 313, 13 P.2d 228, this court quoting from 20 C.J., § 406, p. 1013, said:

" 'In some cases it has been stated that the object of a view is merely to enable the jury better to understand and apply the evidence given in court, and that the view is not itself evidence upon which the verdict may be based. But the general rule is that the jury shall consider the testimony of the witnesses in connection with the facts as they appeared upon the view, and shall ascertain the damages upon the whole case, as thus presented, even if, in so doing, they arrive at a conclusion not in accord with the weight of the testimony. That the jury cannot disregard the evidence and render a verdict based solely upon their personal view of the premises is held in all jurisdictions, except where the proceedings are under statutes which expressly exclude the idea of a jury trial in court, and provide for a determination of the case upon the view alone.' "

This is ordinarily true as said, but where, as here, improper and incompetent evidence has been furnished the jury, as we have previously discussed as to the expert's testimony, a view will not correct the error in the admission of that prejudicial testimony. Our quotation of the owner's testimony, which while admissible by itself, points up further the inappropriate use of the capitalization of income method by the expert and its prejudicial effect.

From what we have said, we are reversing the judgment of the district court and granting a new trial. Specification of error No. 4 does not need discussion, other than to observe that the pleadings themselves bind the State.

MR. CHIEF JUSTICE JAMES T. HARRISON, MR. JUSTICES ADAIR, JOHN C. HARRISON and The HONORABLE

NAT ALLEN, District Judge, sitting in place of MR. JUSTICE DOYLE, concur.