THE STATE OF MONTANA, STATE HIGHWAY COMMIS-
SION OF THE STATE OF MONTANA, AND HARRY L. BURNS,
L. V. SWANSON, OTIS S. WATERS, S. N. HALVORSON
AND ROY L. SORRELLS, AS MEMBERS OF AND CONSTITUTING
THE STATE HIGHWAY COMMISSION OF THE STATE OF MONTANA,
PLAINTIFFS AND APPELLANTS, v. TAM BARE AND LOUISE
BARE, HUSBAND AND WIFE, AND DONALD BARE, A SINGLE
MAN, DEFENDANTS AND RESPONDENTS.

No. 10408
Submitted November 20, 1962. Decided December 28, 1962.
377 P.2d 357

Forrest H. Anderson, Atty. Gen., Daniel J. Sullivan (argued orally), Helena, for appellants.

Jack D. Shanstrom, David B. Fitzgerald (argued orally), Livingston, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment entered on a jury verdict in a condemnation action brought by the State, appellant here, to acquire Interstate Highway right-of-way. The defendants, respondents here, are the owners and operators of a 280 acre dairy farm in Park County.

Complaint seeking condemnation was filed. Necessity for the taking was found by the district court, and commissioners to appraise the property were appointed. The commissioners rendered their report, finding the value of the land and improvements taken to be $7,078 and the severance damages to the remainder at $33,105 for a total award of $40,183.

From the award the State appealed. Trial was had before a jury. The jury awarded $15,948.90 for the land and improvements taken and $26,297.50 for severance damages to the portion not taken for a total judgment of $42,246.40.

The Bare dairy farm consisted of 280 acres. It had been operated as a dairy farm for twenty-five years. It had somewhat over 100 acres of irrigated and subirrigated hay land and the balance was in dry land pasture. Bares had about 35

head of cattle and were licensed to milk 20 head. They had about 135 customers for their milk and sold $40 to $50 worth of milk a day. They raised their own hay and pasture and bought feed grain.

The Interstate Highway right-of-way runs almost through the middle of the farm, dividing it into two main parts and segregating another smaller part. The right-of-way went through several improvements, a small house, a root cellar, two wells, and covered several springs. The meandering creek channel was moved and straightened. Any practical access from one part to the other was cut off. All witnesses agreed that so far as dairying was concerned, Bares were out of business. The taking consisted of 30.81 acres of the heart of the farm.

The landowners testified and a real estate broker testified as to value as will be later discussed.

Following the testimony of these witnesses, a Mr. Armstrong, who had served as a commissioner, was called to testify under circumstances related later.

The specifications of error, three in number, resolve themselves into two parts:

(1) Was the witness Armstrong's testimony competent under the circumstances and

(2) Was there competent evidence sufficient to justify the verdict of the jury?

As to the witness Armstrong: His qualifications were brought out. He had been a farm-machinery salesman, clerk for farm auction sales and had a familiarity with land values. Then he was asked on direct:

"Q. Now Mr. Armstrong, were you appointed by the Court as a Commissioner to appraise the value of the property being condemned by the State of Montana from Tam and Donald Bare? A. Yes."

Then he testified with particularity as to details. At one point he said:

"Q. Now Mr. Armstrong, are you familiar with the path that the U. S. Interstate No. 90 takes as it extends through the Bare brothers' property? A. Yes, after I got on this three-man team of appraisers we went over the Bare place three times together. * * *" At another point:

"Q. Well, in your knowledge of dairy cows and that, would it be possible for the Bare brothers to take the cattle from the dairy barn to the pasture on the north side of the proposed Interstate 90? A. No. May I quote you what was said in the hearing we had the—

"THE COURT: Mr. Armstrong, no. You're testifying now as though you had—

"Mr. Sullivan: I'm going to object to all of this testimony, your Honor, on the grounds that there has been no sufficient foundation laid to call this man to testify as an appraiser.

"THE COURT: What I'm getting at is that you can't testify to what is known as hearsay evidence, what somebody else said. It has got to be your own knowledge. The objection just interposed is overruled."

Again and again the witness Armstrong referred to the three man commission appointed to appraise:

"Q. And that is your own personal appraisal? A. Yes.

"Mr. Sullivan: I would like to voir dire the witness if I may, your Honor?

"THE COURT: Okay.

"BY MR. SULLIVAN: * * *

"Q. Was that appraisal—were you appraising this as a Commissioner? A. We were sworn in, the three of us, at the same time by Judge Allen. We went to work and we went out together, we walked over each tract of land separately and made our notes on our own, separately from each other, made * * *.

"Q. I want to know if you made an appraisal separate and apart from the time that you were working as a com-

missioner in this hearing? A. (To the Court) He wants to know what now?

"Q. If you made another appraisal than an appraisal as a commissioner? A. We went out together as a group of three. We each took our own notes.

"Q. Did you make an appraisal separate and apart from that time? A. We each made our own appraisal, and then at the end when we got all through we got together—

"THE COURT: That's enough. This is your own appraisal? A. My own appraisal? Is that what you want to know?

"Q. Was it made in conjunction with the commission hearing held on this matter last November?

"MR. FITZGERALD: That's objected to, your Honor, as completely immaterial.

"THE COURT: Sustained.

"Q. Were you working as a commissioner for the State of Montana when you made that appraisal? A. Yes, sir.

"MR. FITZGERALD: Same objection, your Honor, and on the additional ground it calls for a conclusion, and ask that the answer be stricken.

"THE COURT: The objection is sustained and the answer is stricken, and the jury are, as before, instructed to disregard any question, the implication of the question, and any answer that might have been made.

"MR. SULLIVAN: I am going to object to the introduction of any appraisal by this man, your Honor, on the grounds that he hasn't made a separate and independent appraisal, and that this evidence is incompetent, and that it constitutes actually just evidence that went to make up in effect, a jury verdict.

"THE COURT: Overruled.

"MR. SULLIVAN: And I'm going to object to it upon the grounds and for the reasons that obviously I can't

cross-examine him because we don't have the record that was introduced or the evidence that was introduced at the commissioner hearing upon which he based his appraisal.

"THE COURT: Overruled."

Then Armstrong was allowed to testify as to values. He finally summed it up:

"The land taken plus the house, sheds, wells and concrete foundation that are being absolutely ruined was $14,183.35. Now the total damages for severance and completely cutting off and doing away with their dairy ranch was $50,000, so it totaled $60,183.35. Now, that's the one that I made."

On cross-examination, the State brought out that Armstrong didn't value the farm before the taking nor place a value on the farm after the taking.

Thus, one of the commissioners was allowed to give testimony. His figure of $60,183.35 was not the commission's award, which was $40,183. While the actual commission's report was not brought out, the witness Armstrong was shown to be a commissioner and repeatedly testified about what the commission did and the reasons for their results. While he gave a value for his appraisal different than that of the commission award, by his testimony his appraisal purported to be the commission award.

The State was faced with the dilemma of trying to impeach the witness by using the commission award and thereby getting the whole commission award before the jury. We hold this to be reversible error. Respondent argues that in Yellowstone Park R. R. Co. v. Bridger Coal Co., 34 Mont. 545, 561, 87 P. 963, 968, this court approved the use of commissioners testifying as witnesses so long as the award itself was not testified to in the following language:

"Criticism is made of paragraph 24 of the charge, because the court therein told the jury that they must not

consider the award theretofore made by the commissioners, but should confine themselves exclusively to the testimony of the witnesses examined at the hearing. This was clearly correct for the reason that the award was not introduced in evidence. The only reference to it was made during the cross-examination of two of the commissioners who were sworn as witnesses at the trial. Being asked as to the amounts fixed by them in their award, they stated amounts which agreed with those fixed by them at the trial. The trial was *de novo* as to the damages. The award of the commissioners could not be competent for any purpose, except to impeach the statements of those commissioners who were sworn as witnesses, in case their opinions expressed at the trial differed from their findings. The caution contained in this paragraph was perhaps not necessary, but it is not erroneous.''

Respondent also argues that in any event the State brought on the matter by further inquiry, as previously quoted, and that therefore one cannot complain of errors which he has permitted or invited. McDonald v. McNinch, 63 Mont. 308, 206 P. 1096. It is observed that on direct examination it was made clear that Armstrong had been a commissioner; and his appraisal, even though his own, has been a part of the commission proceedings. In the Yellowstone R. R. Co. case, supra, it was not an issue as to the competency of the witness to testify at all, the issue was as to an instruction after he had testified. We think on timely and proper objection the competency of a commissioner to testify at all in a trial *de novo* is questionable but we need not decide that here.

That our statutes require a trial *de novo* has been settled in Great Northern Ry. Co. v. Fiske, 54 Mont. 231, 169 P. 44. Also that a commissioner is similar to a juror for some purposes seems clear when R.C.M.1947, § 93-9911, in providing for qualifications of commissioners states: ''Any party may object to the appointment of any person as a commissioner on the same

grounds that he might object to him as a trial juror." For discussion of the use of affidavits of jurors, see Bateman v. Donovan, (9th Cir.1942) 131 F.2d 759.

In Nichols' Eminent Domain, (3rd Ed.) Volume 6, § 26.731, p. 266, it is said:

"The amount of the award and the commissioners' reasons for making it are not admissible in evidence before the jury, * * *. The award should not be brought to the attention of the jury in any form * * *."

The reasoning is well set forth in Halstead v. Vandalia R. Co., 48 Ind.App. 96, 95 N.E. 439, 441, 442, where it is said:

"The entire purpose of the appeal to the circuit court was to obtain a reconsideration of the identical question submitted to and determined by the appraisers chosen for the purpose of fixing the damages to appellant for the land and improvements taken by appellee. The case therefore was to be tried *de novo,* and the award of damages made by such commissioners and included in their report could not be considered as competent evidence of the proper amount of damages sustained by appellant. This rule is well-recognized by the courts of this state. Trittipo v. Beaver, 155 Ind. 652, 655, 58 N.E. 1034, and the numerous cases there cited. The jury in such cases have but one duty to perform, and that is to assess the damages the defendant will sustain by the appropriation of his land to public use, and have no more right to know what the report or assessment of damages of the appraisers was, or the reasons which influenced that assessment, than any jury in any case has to know what the verdict of a previous jury was in the same case, or the method by which that previous jury arrived at its verdict. On appeal from the commissioners and trial *de novo,* the report appealed from is not evidence as to the amount of damages. Lewis on Eminent Domain (3d Ed.) § 669, Missouri, etc., Co. v. Roberts, 187 Mo. 309, 86 S.W. 91. Though in the present

case the appraisers' report itself was not admitted in evidence, the amount of the appraisement and some of the reasons influencing the fixing of that amount were brought in by the testimony of the appraisers, and this was error.''

The Indiana Court did not reverse on this ground, however, finding it harmless error cured by instructions.

While here, the actual commission's report was not brought out, Armstrong's appraisal was brought out as if it were the commission's own with the reasons purportedly used by the commission.

While, what we have heretofore discussed is sufficient to reverse for a new trial, the other claimed error deserves consideration, since it relates directly to an accompanying appeal, Cause No. 10378, State Highway Comm'n v. Smith and Jesson, 141 Mont. 302, 377 P.2d 352.

At the trial, the landowners, Donald and Tam Bare testified. Donald did not testify as to value. Tam expressed an opinion as to value. On direct examination Mr. Bare stated the farm was worth $150,000, that the taking would require $80,000 to make him whole. He testified that the 30.81 acres were worth $250 per acre for a total of $7,702.50. Then he testified to the effect that, since the taking would put him out of the dairy business, the loafing shed was made worthless, the calving shed was rendered worthless, the dairy barn and milking equipment was worthless except as storage places. He placed values of $2,500 on the loafing shed, $1,500 on the calving shed, $7,000 on the value of the dairy barn, the purpose of which was destroyed.

On cross-examination, Mr. Bare testified that he and his brother made a net income of $5,000 on the place in 1959 on a gross income of about $15,000.

The next witness for the landowners, Mr. Paul Working, a real estate dealer in Livingston, was qualified as a land appraiser. He testified that he appraised the property here. On

direct examination he was asked what method he used to appraise the property. He said, ''I valued the place on income, and I adopted the final figure of the damages to the income of the Bare brothers, the damages they'd be entitled to. * * * I tried three methods. I used three methods one of which was comparable sales, another of which was a cost, that is, assume you go out and buy a piece of land, replace the buildings on it, and then depreciate them out to the present condition; and I didn't feel that either one of these other methods adequately represented the damage done to the Bare brothers. * * * I used the income method for my final result.''

The capitalization of income method described by Mr. Working was applied as follows:

''I started by * * * using the Bare brothers' income tax statement [adjusted to a 12 month operation for a single year] * * *

''I started with an annual gross income * * * of $12,858.''

The witness then described expense items of feed, seed, machine hire, supplies, repairs, veterinary charges, gas and fuel, taxes, insurance, utilities, freight, upkeep of machinery, depreciation on real estate, depreciation on livestock, replacement of livestock. He found a total expense item of $7,373.64 which he deducted from the gross of $12,858 leaving a net income (which would be net income for income tax purposes for the two men) of $5,494.67 before the taking.

Then Mr. Working estimated an income after the taking on what he termed the probable use of what was left. This probable use he based on 65 acres of irrigated land with production of 3 tons of hay per acre at an average price of $22.50 per ton for a figure of $4,387 for production of hay per year. Then as he described it: ''Now then, since that [referring to the land above] cannot be operated as a unit, I assumed that the Bare brothers are landlords, as landlords they will get half of that hay production [a 50-50 share crop arrangement]. So

their net from the hay production would be $2,193.75. Now there is a certain value in certain months of the year for pasture in this. * * * I assigned an animal use unit of 60, at a cost of $5.00 per unit, which would bring us $300 in this income figure.'' Then Working assigned a value of $900 per year income for the residence. Then he deducted certain items such as taxes, seed as share-croppers, repairs to buildings, and depreciation on buildings representing a cost value of $1,180.34 annually. Thus he reasoned that the gross income after the taking was $3,393.75 with a net income of $2,213.41.

He then took:

The net income including labor before taking ......$5,494.67

Minus net income without labor after taking ......$2,213.41

Difference in income: ...................................................$3,281.26

This latter figure he related: ''I capitalized that figure at 5½ percent which means estimating the *amount of money that you would have to invest at 5½ percent to have an annual income of this amount,* and that figure is $59,471. I rounded that figure off to $59,500, which I estimate is the damage that has been done to the Bare brothers' operation.'' (There is a slight arithmetical error that appears here in the record, but it does not concern our discussion.)

Note the comparisons of incomes used. The ''before taking'' income is income attributable to the land *plus* the labor involved. The estimated "after-taking" income is on a sharecrop basis; that is, it is income attributable to the land itself *without* labor. Then note, that the capitalization rate is described *as money invested;* in other words, a rate figured on income attributable to investment in the land only. This is like deducting two heifers from five horses and getting three pigs to determine how much bacon is lost.

Continuing on with Mr. Working's testimony, on cross-examination, he testified that he only used figures for one year, viz., 1960, although he ''thought'' it represented an

average year. He said he had used three methods in appraisal, cost approach, market data, and income, but he could not respond to any other method than the one above because, "I don't have that figure here." He could not give a value to the remaining land. He explained his use of the income approach to the income before taking by saying "Many people who like country living are satisfied with a greatly reduced income comparable to what they could have gotten from their money invested in some other way."

This statement does not coincide with the use of the so-called capitalization of income method. The very basis of the method, particularly as to the rate of capitalization, is on the basis of invested capital.

The respondent landowner here argues that this court approved the capitalization of income method in State Highway Comm'n v. Heltborg, 140 Mont. 196, 203, 369 P.2d 521, 524, in that case we said:

"The purpose of setting forth the example [capitalization of income method used by both contestants] is *not to approve or disapprove of any particular method,* but to show that the jury, the triers of the facts, had before it the various figures from opinions of experts, *based upon substantial evidence* of number of acres, tons of hay per acre, aftermath of grass per acre, reasonable return on investment figures, etc., in order that they could consider all of the circumstances which immediately and directly depreciate the present market value of the portions of the whole tract adjacent to the strip sought to be taken as we referred to in the Nett case [Lewis and Clark County v. Nett, 81 Mont. 261, 263 P. 418], supra." Emphasis supplied.

Also in the Heltborg case we noted: "The testimony of the various witnesses for both the landowners and the State, who explained their method of valuation, used the same gen-

eral approach in determining the loss in market value. The approach was labeled the 'capitalization of income' approach.''

In analyzing the capitalization of income approach, a discussion contained in the 1962 Report of Committee on Condemnation and Condemnation Procedure of the Section of Local Government Law of the American Bar Association commends itself to our quotation. There it is said at p. 34,

"In the area of eminent domain as in other fields of law, concise, theoretical standards of valuation often are more effective in the abstract than when subjected to the rigors of practical application. In condemnation proceedings the yardstick used by the courts is 'market value' or 'fair market value.' The fictional representation of a willing buyer and a willing seller arriving at an agreed price in the open market employed by the courts, however, often does not provide just compensation.'' And in discussing the capitalization of *rental* income this statement was made at p. 38:

"Admittedly the best method of arriving at market value is the use of recent sales of comparable property. Additionally, the 'income method' may be used to determine market value, where appropriate. In fact the income producing capacity of real estate is one of the most, if not the most important consideration in determining the value of real estate. However, the majority of courts restrict this type of testimony. This stems in part from the principle that business profits are considered too speculative to be considered in determining value, and partly because courts view comparable sales as a more objective test. Rental property, however, is an exception to this rule. If the monthly or annual rental can be proved with a reasonable degree of certainty, in the absence of other evidence, courts will consider it as a factor in determining value. Normally the rental will be

projected according to the going rate of interest in the financial community.''

From what we have set out, in Mr. Working's application of the method it is patent that this is not an appropriate application. Further, in this case, none of the figures, being based on one year only, and in part pure estimates, have such degree of certainty as to be a credible factor. In the Heltborg case, supra, as our opinion reflects, very careful foundation for production figures, operation figures, and effect of the taking on those figures, were made before any effort was made to apply the capitalization of income method. In addition in the Heltborg case the method used was not the key issue nor even seriously questioned.

While we do not reject the method in all cases, we believe for future guidance in eminent domain cases, the capitalization of income method should be carefully scrutinized even where it may be appropriate as one of the tools of the judicial workshop. We are aware that in some instances, where no comparable sales evidence is available or where it is shown to be not applicable for many reasons, the only usable method is the capitalization method. However, its use must be based on a foundation which minimizes to the extent possible conjecture and uncertainty.

Even though the appellant asserts that the owner's testimony should have been stricken also, by what we have already said, the cause must be retried, and we do not deem it necessary to discuss that feature. The judgment is reversed and the cause remanded for a new trial.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES ADAIR, DOYLE and JOHN C. HARRISON, concur.