The STATE OF MONTANA, ACTING BY AND THROUGH THE STATE HIGHWAY COMMISSION OF THE STATE OF MONTANA, PLAINTIFF AND APPELLANT, v. BIASTOCH MEATS, INC., AND MINERS NATIONAL BANK, BUTTE, MONTANA, DEFENDANTS AND RESPONDENTS.

No. 10731.
Submitted December 8, 1964. Decided March 4, 1965.
Rehearing denied April 5, 1965.
400 P.2d 274.

Daniel J. Sullivan (argued), Donald Matthews, Forrest H. Anderson, Atty. Gen., Helena, for appellant.

Kendrick Smith (argued), Corette, Smith & Dean, Butte, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment entered upon a jury verdict in a highway condemnation action.

The State of Montana, appellant here, acting through its Highway Commission, will be hereinafter referred to as the State. The respondent, Biastoch Meats, Inc., will be referred to as Biastoch Meats.

The eminent domain proceedings involve a complicated word description. We shall set forth here the situation as described by the State in their brief.

"The principal highway going west of Butte, Montana, is a four-lane highway designated as primary 10-91. As this highway approaches Butte from the west a bypass road allows traffic to turn south, overpass the Milwaukee and B .A. & P. Railroad tracks which are located south of the four-lane highway and then about a thousand yards south of these tracks to continue on in an easterly direction toward Butte. This bypass is known as the Centennial Brewery bypass and is a part of the primary highway system. West of this bypass road and south of the four-lane road are located from north to south the following: a concrete highway known as the old Rocker Road, then the Milwaukee and B. A. & P. tracks. South of this is another road, this is unpaved and called the county road or Centennial Avenue extended. The access to this dirt road is from the Centennial Avenue bypass at approximately the place the bypass turns to the east. This dirt road goes from the bypass road past the Schumacher Meat plant then through the Tiger Lode Claim and on west toward Rocker. South of this road is the Isele Placer Claim. In an area carved out of this claim is located the Biastoch Meat Plant, the north line of the meat company area being the north line of the Isele Placer. South of the meat company, but within the Isele Placer is located Silver Bow Creek. South of the creek are the Northern Pacific Railway tracks. The Interstate highway through Butte is south of the Northern Pacific tracks. As it proceeds west

out of the city at a point southeast of the Biastoch Meat Company and still south of the Northern Pacific tracks, the four lanes of the highway are split. Two lanes being the south and west bound lanes of traffic are carried by a structure over the Northern Pacific tracks and proceed north across Silver Bow Creek, through a portion of the Isele Placer and between the Biastoch Meat Company plant and the Schumacher Meat Company plant. It then proceeds north across the county road, called Centennial Avenue extended, over another structure crossing the Milwaukee and B. A. & P. tracks and the old Rocker (concrete) road. It then continues north to merge with the present four-lane highway going west out of Butte. As this leg, as it is called, of the highway goes through the Isele Placer and between the two meat packing plants, it hits the northeast corner of the Biastoch deeded land resulting in a taking of the deeded property of *nine (9)* square feet. As it proceeds north from the Isele, it goes through the Tiger Lode and severs the old county road. This severance is by a fill approximately 35 feet high necessary because of the structure over the Milwaukee, B. A. & P. tracks. In addition this leg also severs Silver Bow Creek in the Isele Placer. The other two lanes of the Interstate, being the north and east bound lanes of travel, are carried westerly south of the Northern Pacific tracks, then structured over the Northern Pacific tracks and Silver Bow Creek and proceed north through the Isele Placer, the Tiger Lode and then by means of another structure over the Milwaukee and B. A. & P. tracks and the old Rocker (concrete) road. They then go north where they also merge with the present four-lane highway west of Butte. This leg of the highway does not touch any property owned by the Biastoch Meat Company, but also severs Silver Bow Creek, the old county road and the old Rocker (concrete) road. Thus after construction, the Biastoch Meat Company will be between two legs of the Interstate highway.

"The exhibits and testimony show that the construction in

regard to the severed creek and roads will be as follows: The channel of Silver Bow Creek was changed and a new channel constructed south of the previous creek bed and along the north line of the Northern Pacific tracks bringing the creek under and through both of the structures over these tracks. The county road was re-established as follows: at a point just west of the Schumacher plant the road was constructed north toward the Milwaukee and B. A. & P. tracks. Just south of these tracks this road then turned west and proceeded along the south line of these tracks through the Tiger Lode and underneath the structures carrying both legs of the Interstate over the tracks and then on westerly to reconnect with the existing county road. Between the legs of the Interstate and near the north and east bound legs however, an access road was constructed turning south and then back east toward the Biastoch plant. This road then merged with the county road then existing in the Tiger Lode. This county road ran north of the Biastoch plant. The new access road connected with this road at a point west of the Biastoch plant. Access from and to the Biastoch plant would be over the following route which we will describe from the plant to the end of the construction. To leave the Biastoch plant you would proceed through a part of the Tiger Lode to the existing county road. Then you would turn west on this road to the point where the new access road merges with the old county road. You then turn north along the new access road until you reach the south access road. You then turn east, proceed under the structure carrying the south and west bound travel over the road and the Milwaukee and B. A. & P. tracks, when you are past the structure you then turn south until you reach the existing county road or Centennial Avenue extended. Then turn east on this road. From that point on, the travel is the same as it was prior to any construction for the Interstate.

"South of the Biastoch Meat plant the severance of Silver Bow Creek presented another problem in respect to a sewer

which emptied from the Biastoch plant into Silver Bow Creek. Since the creek was being moved south, this sewer had to be re-established. This was done by the State of Montana, so that the re-established sewer emptied into the new channel of Silver Bow Creek.

"Prior to the construction, Biastoch had utilized an area in the Tiger Lode north of the plant to get to the county road or Centennial Avenue extended. This area right north of the plant providing access to this county road was not affected by the construction. In addition, however, Biastochs had also utilized a road east of the plant which road turned south off the county road across the Tiger Lode and then into the Isele Placer. Within the boundaries of the Isele Placer and east of the Biastoch plant and deeded area this road then split one fork going west toward the garage or enclosed loading dock and the other fork going south and west toward the corrals and back of the Biastoch plant."

From the foregoing word description can be added a summary to the effect that the Biastoch plant has been surrounded and blocked by the high embankments of Interstate highway lanes on two sides, a changed channel of the creek with a high dike so that these results occur and are made to appear from the testimony:

(1) There is no reasonable access to the east side of the plant where deliveries of meat are made;

(2) No adequate sewer provisions are made;

(3) No drainage of the area to the rear can be had;

(4) No plans to maintain the new road on a more circuitous route; and

(5) The plant is left in a state-created dead-end valley or what was known in western story books as a blind box-canyon.

The jury viewed the premises and fixed damages at $135,-004.50 by their verdict.

The fact situation is viewed in two extreme positions, the State asserting it only takes nine square feet of deeded prop-

erty, whereas the landowner asserts that the taking practically destroys the entire plant because of drainage, access to the loading dock and to the rear of the plant, and blocking off of light and view.

More will be related concerning the facts as they relate to the specifications of error.

Eighteen specifications of error are urged. Specifications of error 1 through 8 deal with alleged errors of the trial court having to do with flooding and drainage problems presented, both as to evidence and instructions. The next grouping by the appellant of the alleged errors have to do with specifications 9 through 12 alleging errors in instructions concerning access to the loading docks and to the rear of the plant. The third grouping, 13 through 16, have to do with the admissibility of testimony of witnesses Biastoch and Olds. The fourth grouping, 17, asserts that the verdict is contrary to law; and the fifth grouping, 18, asserts that the evidence is insufficient to support the award of the jury.

As to the first grouping of error: The date of the summons was August 14, 1962. It had been agreed, however, that January 23, 1962, the date defendant Biastoch gave the State a grant of possession of the property to be taken, was the date of valuation. The trial was held in May of 1963. The theory of Biastoch Meats in offering evidence in the absence of adequate or any drainage was set forth to the trial court as follows:

"MR. SMITH: May it please the Court, the theory of the defendants is that by reason of the taking and by reason of the improvements proposed by the State of Montana, there has been a failure to provide draining and that water comes down in this area in such a fashion as to seriously, materially interfere with the use of the property by the defendants.

"We are not asking for damages during the construction. We are asking for damages because of the failure of the State of Montana to provide for drainage from the area of the blocked channel of old Silver Bow Creek and the building up

of the dike at the end of that. Biastoch is in the middle of a 'U,' one leg of the 'U' being the interstate highway and the other leg of the 'U' being the interstate highway. The bottom of the 'U', an artificial bank which we have already shown on the new channel which blocks off Silver Bow Creek effectively on the east, on the west and on the south. The drainage comes from the North.

"Proceeding on the theory, we have asked the State of Montana an interrogatory, it is interrogatory number 12, which reads: 'Did the State of Montana on January 23, 1962, or August 14, 1962, have any provisions in its plans of construction for the draining of water that accumulates south of the plant of Biastoch Meats, Inc., between the two separated lanes of the new interstate highway, and if so, what were those plans and were they shown on any maps existing at either of said times?'—to which the State of Montana, acting through Mr. Sullivan, has given the flat answer 'No.'

"It is therefore our desire to introduce this interrogatory and answer as an admission by the State of Montana, that it had no such plans and that not only prospectively was this going to cause damage but that it actually has caused damage. We are not asking for that damage occasioned by that event, but we are asking to show that the actual experience is just as we anticipated and just as we forecast that there is going to be very serious damage to this plant by reason of the funneling of water down to this area where it cannot escape.

"It is on that basis we are asking and seeking to introduce this evidence."

"The State's objection on the matter of the drainage problem was that it would not be compensable, that it occurred during construction, and was beyond the date of the summons and had nothing to do with the damage to the defendant.

The witness, Curt Biastoch, testified as to the general drainage of surface water on a slope toward the south to Silver Bow Creek; that the whole country was generally sloped to the

south; and that formerly run-off water went to the south of the plant and spread over a wide area and ended up in Silver Bow Creek. He stated that the plans of the State were to block off the old channel of Silver Bow Creek and that appeared to be what was happening in the construction of the new highway. He stated that the old channel was shown by exhibits and that the area being built up for the new channel was about 10 to 15 feet above the level of the old Silver Bow Creek channel. This high dike extended along the new channel to both legs of the high fills of the interstate highway. This evidence went in without objection.

Then the witness Curt Biastoch testified that an accumulation of snow of a foot to fourteen inches ran off in two or three days and caused a large amount of water to come down from up above the plant, through the plant, around the plant, and to flood the back of the plant to a depth of about 6 feet in places. Other witnesses testified to the same things as well as the effect on sewer drainage.

The State's objection to all of the evidence concerning drainage and flooding was to the effect that the State had a right to dike surface water away from its own property, the theory being that the State would have no duty with reference to the private property of other persons, nor with the fact that the natural flow and drainage of the Creek was being completely blocked. We shall dispose of this contention before turning to other matters specified as error concerned with drainage and sewage.

To support its objection and argument here, the State cites Le Munyon v. Gallatin Valley R. Co., 60 Mont. 517, 199 P. 915. In the LeMunyon case the court was very careful to point out that they were dealing with surface water only and that trespassing waters not in a water course were vagrant and no obligation was owned by the defendant in the protection of its land from the encroachment of such waters. In the instant case, not only did the State dike the north bank of the new channel,

it eliminated the old channel and formed a flood basin. This is in the nature of what was expressed in O'Hare v. Johnson, 116 Mont. 410, 153 P.2d 888, where it was said:

"The statute requires that, 'One must so use his own rights as not to infringe upon the rights of another.' Sec. 8743, Rev. Codes. [1921, now R.C.M.1947, § 49-106.] The law is as stated in Newton v. Weiler, 87 Mont. 164, 286 P. 133, 139: 'Defendant, as the proprietor of his land, has the right to use his land as he pleases, and has the right to change the flow of the waste waters thereon in the reasonable enjoyment of his own property, subject to the limitation embraced in the maxim, " 'sic utere tuo ut alienum non laedas,' or as is said in some of the cases, the use must be without malice or negligence." Ryan v. Quinlan, 45 Mont. 521, 124 P. 512, 516.' "

█ From our attempt to give a word picture of the results of the taking here, it can be seen that the State has constructed a funnel to gather the waters, and then blocked the outlet, and would now say that this result is not damaging to the property remaining after the taking—this is absurd.

Along with the State's general contention that no obligation was owed by the State against flooding, the State contended that the evidence of flooding damage should have been excluded because it occurred *after* the date of summons and after the taking.

The trial was in May of 1963. Testimony over objection was introduced in regard to a flood in 1963 which occurred due to a sudden thaw and run-off of snow accumulation. In other words, rather than prospective testimony of what might happen, actual testimony of what did happen was offered.

█ While normally, R.C.M.1947, § 93-9913, established the date of summons as the date used to measure values, and here it was agreed that the date of the grant of possession, January of 1962, would establish it, nevertheless, evidence of actual results of the taking may be proper, and we so hold here.

In 5 Nichols on Eminent Domain, § 23.4, p. 550, it is said:

"\* \* \* It was formerly considered that the jury was bound to shut its eyes to everything which had actually occurred after the taking, and it was held that evidence could be admitted only as to the character of the structure that would probably be erected, its probable effect on the remaining land \* \* \*. The modern and more enlightened rule is that it is competent to show the mode in which the work was actually constructed, the actual effect of its construction and operation upon the remaining land \* \* \*."

█ Here where the result of the improvements (and not the construction) as to the drainage was shown by direct, positive evidence as to what happened when the natural channel of Silver Bow Creek was cut off, and with a high dike to block the new channel for any escape of water, such evidence going to damages is admissible.

█ We have, above, parenthetically referred to the fact that damages during construction were not in issue. The State argues that it was, and that it should have been allowed to present evidence that the actual construction had remedied the drainage problem. The State in its brief asserts that all damages should be related to the completed construction and cannot be predicated upon the situation during the construction period. This is so, but the State also admits that the plans for construction *did not* provide for drainage south. The State then asserts that it *had provided drainage,* an accomplished fact, but was prevented to its prejudice from showing it. We have checked the record and cannot find any such prevention or offer of proof or any other fairly-presented matter for the court to have ruled upon.

It would be logically and practically impossible to try a condemnation action in advance of the completion of the project without a consideration of the improvements "in the manner proposed by the State" as of the time of the determination of value.

We shall not dwell further on this matter except to say that

the situation concerning the sewer was much the same as that of the other flooding. The improvements when completed were shown to have damaged the remainder. The instructions complained of under this category of specifications are largely covered in our discussion here.

Next we shall look to the alleged errors concerning access to the loading docks and to the rear of the plant. As put by appellant, "this issue concerned whether or not the defendants had proven that they had an easement through the Isele Placer for a roadway servicing the loading dock and the rear doors of the meat plant."

The State offered Instruction 33, that damage must be confined to only the deeded tract. The court, however, gave two Instruction 8 and 15, which permitted the jury to consider whether there was a deprivation of access to the loading docks and to the rear door of the plant and to determine whether the defendants had proven the existence of a prescriptive right and easement to use this access roadway.

According to the direct testimony of Curt Biastoch the access road on the east side of the plant had been used since the year 1930. He testified that everyone could see the road, that it had been used under a claim of right, that it had been used continuously, that no one had ever attempted to interrupt the use and that at all times a claim was made by himself to the use of the road. Exhibits were introduced showing the road. Its exact location was further identified with relation to the old family home.

The loss of this access was shown by the distance between the northeast corner of the plant and the west right of way line as being 19 feet. To go through this opening it is necessary to go up or down a 22 percent grade, or 3.45 feet in a distance of 15 feet. The loading dock and doors open onto the east access road and all loading must be done in an enclosed area. There simply was not enough room between the corner and the right of way fence to turn out of the garage and go up

the hill and trucks would have to go down behind the plant, turn around and make a straight shot up the access road. There was much credible testimony that it was impossible to use the access as a practical matter.

Substantially, the only evidence offered in an attempt to counter the access matter was by use of State's exhibit 1 which was a file of the Anaconda Company with correspondence and other matters resulting in a quitclaim deed from the Anaconda Company to Biastoch, without compensation. The purpose of the transaction was clearly shown for the purpose of clearing the title so that in a quiet title action the Anaconda Company would not have to be joined as a party. The State urges that this shows a lack of hostile possession, and thus, that no easement by prescriptive use was shown. We think, as the trial court did, that the contrary is equally shown. Instructions 8 and 15 properly submitted the matter to the jury.

The third grouping of errors concerns the admissibility of testimony and the motions to strike testimony of Curt Biastoch and Mr. Olds. We have some difficulty in discussing this grouping because the State does not specifically point out the testimony or the objections thereto. The respondent's brief assumes that the reference is to the testimony of Curt Biastoch and the objection thereto. Since the State does not dispute respondent's assumption we will direct our discussion just as has respondent. The objection of the State was as follows:

"MR. SULLIVAN: To which we object on the grounds and for the reasons that there is no foundation laid that this witness—by this witness, that he owns or has an easement in any other property, other than that set out in the parallelogram; there's no foundation laid that this witness—that the corporation has actually a vested right in the county road, and that therefore, there is not a sufficient foundation to give an opinion as to the damage, based upon those items."

Prior to this there had been a great amount of testimony and exhibits going to all of the points raised in the objection as

shown in our discussion previously. At great length, Mr. Biastoch testified about all of this property. As one of the owners of the plant, he testified that the damage done was $150,000, and on cross-examination again testified that the $150,000 had an actual relationship to fair market value; that he considered the sale of the Hansen Packing Company plant which was outdated, outmoded, and had not been in operation for more than 30 years, that he had taken everything together and in his estimation it was worth $150,000, but that he had not included good will in his valuation and had not included accounts receivable in his valuation.

As to Biastoch's testimony, it is clear that as an owner he can testify to the value of the property for the use to which he is putting it. (Alexander v. State Highway Comm'n, 142 Mont. 93, 109, 381 P.2d 780.) Also, as the rule was laid down in State Highway Comm'n v. Peterson, 134 Mont. 52, 328 P.2d 617, he was shown to have "some peculiar means of forming an intelligent and correct judgment as to the value of the property in question beyond what is presumed to be possessed by men generally."

As to the witness, Robert J. Olds, the testimony revealed that he had been in the real estate business in Butte for 15 years, and a substantial portion of his business had been in connection with the valuation and sale of property. He had done a great deal of appraisal work and had valued property for the State in condemnation matters. He was acquainted with the concept of market value as meaning a willing buyer and a willing seller and he undertook the assignment of a valuation of the Biastoch Meat property. He knew its location, he studied the exhibits, made an examination of the property and of the sewer line; he was given information as to the business in the years 1960-1961 and for the first three months of 1962. He studied the business and the operation itself. He tried to determine whether there were any comparable sales on similar property and could find none. He further found that the Hansen

Packing Company transfer was not comparable. The following exchange occurred during cross-examination:

"Q. Did you feel there would be a loss of income, by reason of the construction, from this property? A. I did.

"Q. Is that part of your appraisal? A. It is, yes.

"Q. I am going to ask that the appraisal be stricken, your Honor, on the grounds it's on the loss of business and it's held to be a noncompensable item.

"MR. SMITH: I will resist the motion, your Honor, on the ground the witness testified complete, total destruction and of course, on complete total destruction, all of the income is gone.

"THE COURT: Overruled.

"Q. Now did you rely almost entirely on reconstruction cost new less depreciation to determine the valuation of the property? A. No.

"Q. What approach to valuation did you use? A. I took the combined figures of the profit and loss and the reconstruction cost, judgment, my discussing the operations of the plant, projected future, lumped them all into one and came up with a figure of $146,000."

 The State complains that the witness did not state the facts and data sufficiently so that the jury could weigh the fact. The State urges the proper rule to be that expressed by the Oregon Court in Henderson v. Union Pacific R. R. Co., 189 Or. 145, 167, 219 P.2d 170, 180, that:

"It is the rule in this state, as elsewhere, that 'an expert, though thoroughly qualified as a witness, cannot be permitted to give an opinion upon facts known to him, and not communicated to the jury'; that 'no allegation can be proven by the *ipse dixit* opinion of any expert unless the facts or phenomena upon which he bases his opinion are disclosed either by his own testimony or that of other witnesses.' [Citing cases.]"

 We believe the above rule to be proper, and while we do not approve of any *ipse dixit* opinion, where as here, complete opportunity was afforded on cross-examination to de-

velop the facts and such opportunity was not taken, we fail to see how the State was prejudiced. Under the rules of this Court in recent decisions, such as State Highway Comm'n v. Bare, 141 Mont. 288. 377 P.2d 357; State Highway Comm'n v. Smith, 141 Mont. 302, 377 P.2d 352, and State Highway Comm'n v. Crow, 142 Mont. 270, 384 P.2d 273, where there are no comparable sales, evidence based upon revenue and valuations based in part thereon are competent and admissible. Insofar as the witness used reconstruction cost, that was only a part of his final judgment figure. This evidence, when taken in conjunction with other testimony, was not shown to be such as to be excluded nor stricken on the exchange set forth above.

The fifth point raised is based on Specification of error 18 that the evidence is insufficient to support the verdict. From this statement of the alleged error, the appellant restates it so that it says, "the jury verdict is so obviously and palpably out of proportion to the injury done as to be in excess of just compensation as provided for by section 14, Article III of the Montana Constitution."

The matter of excessive damages given under the influence of passion and prejudice was raised on motion for new trial. The court denied the motion. While the specification of error is not directed to the denial of the motion for new trial, and this court has in Sullivan v. City of Butte, 117 Mont. 215, 221, 157 P.2d 479, held that such a matter must be so directed, we shall consider it.

In eminent domain proceedings, the jury findings will not be disturbed on appeal unless they are so obviously and palpably out of proportion to the injury done as to be in excess of just compensation. State Highway Comm'n v. Peterson, 134 Mont. 52, 328 P.2d 617; Alexander v. State Highway Comm'n, 142 Mont. 93, 103, 381 P.2d 780; State Highway Comm'n v. Manry, 143 Mont. 382, 390 P.2d 97.

Three witnesses testified for the owner to the taking and damages. Harold Pitts, President of the Miners National

Bank, placed a market value of $4.50 for nine square feet and a value of the damage to the remainder of $116,000.00; Biastoch, one of the owners, placed a value of $150,000.00 and Olds, the realtor, placed a value of $146,000.00. The jury verdict was for $4.50 of the land taken and $135,000.00 for damages to the remainder. These figures contrast with a State's appraiser who found a $5,000 damage to the remainder figure due to what he termed "functional obsolescence." We have examined, too, the valuation set by the Commissioners which was $142,004.50. A minority Commissioner's report set the value at $85,000.00.

Such wide divergence of views and opinions were submitted to the jury on instructions. There was a great deal of evidence of impairment of access, evidence of severe flooding and such a resulting condition that such flooding was not only possible but inevitable, evidence that the sewer line was made ineffective, evidence that the manufactured valley or funnel, hidden from view would be difficult to find and difficult to use.

The conclusions and opinions of the property owners' witnesses were that a 30-year-old going business employing 14 men was ruined.

Additionally, a motion to strike the bill of exceptions has been made by the respondents, but since we have disposed of the case on the merits, we shall not discuss it.

Finding no reversible error, the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES DOYLE, JOHN C. HARRISON and ADAIR concur.