DEE ALEXANDER, Plaintiff and Respondent, *v.* THE
STATE OF MONTANA, STATE HIGHWAY COMMIS-
SION et al., Defendants and Appellants.

No. 10868.

Submitted March 8, 1966. Decided March 24, 1966.

411 P.2d 414.

Forrest H. Anderson, Atty. Gen., Chadwick H. Smith (argued), Helena, for appellants.

Robert R. Skelton (argued), Thomas P. Hendricks (argued), Missoula, for respondent.

PER CURIAM:

This appeal is taken by defendant-appellant State Highway Commission from a verdict and judgment in favor of plaintiff-respondent Dee W. Alexander entered in the District Court of Mineral County.

This cause was before this court in 1963 as Alexander v. State Highway Comm., 142 Mont. 93, 381 P.2d 780. In that appeal this court ruled that a $24,500 verdict for the plaintiff was "obviously and palpably out of proportion to the injury done as to be in excess of just compensation."

At the second trial, here again appealed by the State, the jury returned a verdict of $20,000 for the plaintiff.

The fact situation, including pictures of the property, is fully set forth in the first case, supra, and but brief mention thereof is here required.

In 1958, Alexander built a cement batching plan in Superior, Montana. He built it on leased land. He built it himself. He used, for the most part, second-hand material. The plant was small—producing about 50 yards of cement a day—and was constructed to enable one man to operate it with the aid of gravity. It was built on the side of a hill.

The State condemned the land and built a highway over it beginning June 1, 1960. The leased land upon which this structure stood was bought by the State prior to June 1, 1960, and eventually a quiet title action was commenced which found the

title to the land in the State burdened with a claim in favor of Alexander in the amount of the fair market value of the concrete mixing plant as it existed June 1, 1960, when the State entered and took possession of the property.

The appraiser for the State, not being able to find similar property with which to compare the plaintiff's plant, attempted to determine the fair market value by calculation of its reproduction cost—an amount determined to be $2,400 less $600 depreciation, or a total of $1,800. Other state witnesses placed reproduction cost between $500 and $1,000.

The plaintiff contends his injury was more in the amount of $35,000. This very contention prompted this court in the first appeal of this cause to modify its rule concerning the testimony of an owner of property taken through eminent domain proceedings by the State, saying:

"We now restate the rule to be that an owner, upon *prima facie* proof of ownership, shall be qualified to estimate *in a reasonable way* the value of his property for the use to which he has been putting it." Alexander v. State Highway Comm., 142 Mont. 93, 110, 381 P.2d 780, 789.

Since this court wrote the words "in a reasonable way," we must now attempt to determine whether this particular plaintiff-owner meets that equitable test. Toward the end of the first day of testimony at the trial, the plaintiff was asked on cross-examination, how he arrived at the $35,000 figure.

"A. Oh, yes. The $35,000 figure, I arrived at that from the convenience of my plant and the business that I had lined up for that plant."

This answer the plaintiff later claims was given in confusion and through misunderstanding of the question asked. The next day he testified as follows:

"A. Yes. The cost of building this plant for one thing; the location of it which was very convenient; and where it was located, right in my yard; the area of which I sold concrete, all of Mineral County * * * and the way that I had the plant con-

structed to where I could run concrete cheaper, enough to compete with the towns, both Missoula and Wallace, or any of the adjoining towns, I could compete in price with the bigger plants and still turn out the same kind of products ,just as good in every way.

"COURT: Well, now that is all very interesting but you haven't said how you arrived at the $35,000. A. Well, the value of the plant and the value of the business, and what it cost me to reproduce another plant."

Sometime after the above testimony, the plaintiff said:

"A. Because it is impossible if I built another plant, completely built somewhere else, to be as good a plant or to do the job as good as my own did * * *."

Bearing in mind the above "reasonable estimate" test, let us examine the quality of Mr. Alexander's plant and product.

The plant itself was constructed of about 160 used ties; less than 2,000 board feet of lumber; 100 feet of $\frac{5}{8}$" cable; deadmen and turnbuckle; three water tanks; a conveyor belt and motor; and various other items to hold everything together. Some of these items were salvaged and removed from the area by the plaintiff.

As for the product he produced, since his plant did not have scales of any kind, or other standard measuring devices or testing equipment, he was unable to produce cement which met government standards. His cement was apparently quite suitable for purposes requiring no specifications. He was able to sell his product at a profit and made a living thereby.

The $35,000 estimate given by the plaintiff for the above plant, product and business, its convenience and location, would be equivalent, by comparison, as shown by the record, to more than two brand new portable Ready-Mix cement batching plants, completely equipped with electric motors, water tanks, hot water heaters, scales, gauges and measuring devices —in other words, all the equipment required to produce cement to any specifications desired, and all this on a portable unit.

Or, for the same amount $35,000, the plaintiff could purchase a fleet of more than 10 such contraptions in a used condition, each capable of producing in an hour what it took the plaintiff's plant about a day to produce.

At least, by comparison, we feel that the plaintiff's estimate of the value of his cement batching plant was, to say the least, not reasonable. We feel that his testimony was speculative and conjectural and caused the jury to return a verdict wholly out of proportion to the injury caused.

Other witnesses who testified for the plaintiff also stated that his plant was worth between $30,000-$40,000. One of these, a Superior contractor, based his estimate upon the fact that Alexander had no competition in Superior in 1960. The other, a man from Hamilton who owned a plant similar to Alexander's had never laid eyes upon the plaintiff's plant while it was in existence. This testimony further led the jury to its excessive verdict.

In Yellowstone Park R. R. Co. v. Bridger Coal Co., 34 Mont. 545, 563, 87 P. 963, 968, this court said, referring to the jury:

"* * * The real inquiry is 'whether the verdict is fair and reasonable, and in the exercise of sound discretion, under all the circumstances of the case, and it will be so presumed, unless the verdict is so excessive or outrageous with reference to those circumstances as to demonstrate that the jury have acted against the rules of law, or have suffered their passions, their prejudices, or their perverse disregard of justice to mislead them.' 13 Cyc. 122."

We feel the jury in both trials of this cause were influenced by conjectural and speculative testimony. The verdict in this trial, as it was in the first trial, is obviously and palpably out of proportion to the injury done as to be in excess of just compensation.

Just compensation is determined by equitable prin-

ciples. Its measure varies with the facts. Where the circumstances will not permit, the value of property cannot be measured solely by formula or artificial rule. Perhaps the present situation requires consideration of factors beyond the usually acceptable practices and methods employed in determining fair market value in eminent domain proceedings.

This court has long practiced the policy of not interfering with the findings of the jury in eminent domain proceedings. State Highway Comm. v. Peterson, 134 Mont. 52, 58, 328 P.2d 617. It is regrettable that for the second time in this case we must do so.

Sound judgment and discretion, stripped of conjecture and speculation, enable determination of the maximum compensation which can be considered fair and just to both the plaintiff and the State.

After a careful study of the evidence upon this appeal we are of the opinion that the sum of $7,500 is a liberal maximum sum sufficient to fully compensate plaintiff for the damages sustained.

The cause is remanded to the district court, with directions to grant a new trial, unless within ten days after the remittitur is filed with the clerk of that court, the plaintiff shall file his written consent that the judgment for damages may be reduced to $7,500, together with interest at 6 percent from June 1, 1960. If such consent is given, the judgment will be modified accordingly and, as modified, will stand affirmed. If plaintiff does not consent to such reduction of damages, the court is directed to grant a new trial.

In case the reduction is accepted by respondent, each party shall pay their own costs on this appeal; but in case the reduction be not accepted and the case finally stands reversed, appellant shall be entitled to costs as in ordinary reversals under the rules of this court.

Motion to dismiss this appeal was filed by respondent but in our view the grounds thereof are not meritorious and the motion is therefore denied.

MR. JUSTICE CASTLES deeming himself disqualified did not participate in this appeal.