JOHN DOOLING, JOHN S. DOOLING and JAMES J. BER-
TINO, Plaintiffs and Respondents, v. JOHN JAY CASEY,
BRIGHT-HOLLAND COMPANY, et al., Defendants and
Appellants, BRIGHT-HOLLAND COMPANY, et al., Plain-
tiffs and Appellants, v. DOROTHEA DOOLING, Defend-
ant and Respondent.

No. 11509.

Decided December 18, 1968. Rehearing denied January 16, 1969.

448 P.2d 749.

268

Lyman H. Bennett, Jr. (argued), Bozeman, for appellants.

Kendrick Smith (argued), Butte, W. G. Gilbert, Jr., Dillon, for respondents.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

This is an appeal from a net judgment in the amount of $62,952.15 in favor of the buyers under a contract for the sale of land covering damages awarded them for breach of contract reduced by the amount due on a promissory note given in partial payment of the purchase price. All claims for relief and defenses were litigated in one jury trial in the district court of the Fifth Judicial District of Montana before the Honorable Philip C. Duncan, district judge.

Two separate suits were consolidated for trial herein. The first suit, hereafter called the "main action," was a suit for breach of contract of sale of land. Plaintiffs in this "main action" were the buyers under the contract: John Dooling, the father; John S. Dooling, the son; and James J. Bertino, the son-in-law. Defendants in the "main action" were three Nevada corporations, which were the sellers under the con-

tract, together with their president and sole owner. The three Nevada corporations were Bright-Holland Company, Maremount-Holland Company, and Nemeroff-Holland Company, hereafter referred to collectively as the Holland corporations. John Jay Casey was the president and the sole owner of these three Holland corporations.

The other claim, hereafter referred to as the "second action," involved an action by sellers for judgment on a promissory note for $50,000 given as final payment under the contract for the sale of the land. The claim involved in this "second action" was brought by the payees on the note, the Holland corporations, which were also the sellers under the contract, against the makers of the note—the two Doolings and Bertino, who were the buyers under the contract; and Dorothea Dooling, the former wife of the elder Dooling.

Plaintiffs in the "main action" operated a cattle ranch in the Big Hole country southwest of Dillon and wanted to expand their operations by acquisition of adjoining land. In early April, 1965, plaintiffs met with John Jay Casey. Casey controlled the adjoining land, part of which was owned by his Holland corporations, and part of which was owned by his daughter, Ellen Casey Williams, from whom he had a power of attorney. Casey marked the property he was willing to sell on a forest service map which included, among other things, some grazing land owned by the United States on which his daughter held a 500 head term grazing permit from the Forest Service. According to plaintiffs, Casey told them that this permit would be included as part of the deal.

The contract was hammered out at a series of meetings at a Dillon bank, essentially on April 29 and 30. Those present at these meetings, or at least some part of them, were: Casey; the buyers; a Mr. Buba who was apparently an accountant representing Dorothea Dooling; James H. Marshall who was the representative of an insurance company involved in financing the transaction; a Dillon attorney who drafted the con-

tract on behalf of the buyers, the sellers, and the insurance company financing the transaction; and a Dillon banker who was apparently assisting the buyers, the sellers, and the insurance company financing the transaction. During these meetings Casey repeatedly assured the buyers that the 500 head term grazing permit would be transferred to them as part of the deal, according to plaintiffs.

Casey did all the negotiating for the Holland corporations and Ellen Casey Williams.

The contract was drafted by the Dillon attorney, and on May 5 it was executed on behalf of the Holland corporations, as sellers, by Casey as their president, and individually by plaintiffs as buyers.

The contract provided that the sellers agreed to sell and the buyers agreed to buy certain described lands, personal property, leasehold interests and grazing permits. Included in the latter was the grazing permit that is the subject of controversy in the instant case. The total purchase price was $950,000 payable $20,000 by May 7, $880,000 by June 10, and a promissory note by June 10 in the amount $50,000 payable in two years. Sellers agreed to place in escrow with a Dillon bank for delivery to buyers and Dorothea Dooling the following documents: (1) Warranty deed conveying the lands, (2) Bill of Sale transferring the personal property, (3) Assignment of the leasehold interests, and (4) "a waiver of grazing preference, 4 copies, Forest Service Form 2200-12, in favor of Buyers and Dorothea M. Dooling, to the grazing permit described in Exhibit 'C'." This latter item was described in "Exhibit C" as "United States Department of Agriculture Forest Service Permit to graze 500 head of cattle upon the Beaverhead National Forest."

On the same day that the contract was executed, John Jay Casey, as attorney-in-fact for Ellen Casey Williams, executed a quit claim deed on her behalf to the Holland corporations covering that part of the lands owned by her which were

being sold to buyers and Dorothea Dooling under the contract. Casey, as president of the Holland corporations, also executed a warranty deed on their behalf to buyers and Dorothea Dooling covering all lands sold to them under the contract. Additionally he assigned the leasehold interests.

At the same time Casey, as attorney-in-fact for Ellen Casey Williams, executed a "Waiver of Grazing Privileges" Forest Service Form 2200-12, covering the 500 head grazing permit on the Beaverhead National Forest, and a second waiver form as president of the Holland corporations. Each was based on a purported sale of all the land covered by the contract, the first from Ellen Casey Williams to the Holland corporations, and the second from the Holland corporations to the buyers and Dorothea Dooling. The ultimate result of this "double waiver" was cancellation by the Forest Service of Ellen Casey Williams' grazing preference and permit, and denial of any grazing preference or permit to buyers and Dorothea Dooling except a temporary permit for 1965 which was not renewed.

On May 15, 1967 buyers filed the "main action" against sellers and Casey alleging breach of contract to transfer the 500 head grazing preference and permit to them. Plaintiffs' claim was also based on alleged fraudulent or negligent misrepresentations and non-disclosures by Casey with reference to the grazing permit and the transfer thereof which induced them to enter into the contract; they claim unjust enrichment of sellers and Casey by reason thereof.

The answer of the sellers and Casey amounted to a general denial with a counterclaim against buyers for payment of the $50,000 promissory note given as final payment under the contract, interest thereon, and attorney's fees. Sellers also filed a separate suit covering the same claim as was contained in the counterclaim in the "main action" against Dorothea Dooling, who was a maker on the note but not a party to the contract. The buyers and Dorothea Dooling admitted that they owed

the note but claimed the right to offset such amount against what was owing them on their claim in the "main action." All claims were consolidated for trial.

After motions for summary judgment by the respective parties were denied, the entire controvsersy came on for trial on April 1, 1968. Motions for a directed verdict by sellers and Casey were made at the conclusion of plaintiffs' case-in-chief and again at the conclusion of all the evidence. Both were denied by the court and the entire controversy was submitted to the jury, except the matter of attorney's fees on the promissory note which was reserved for later determination by the court pursuant to stipulation of counsel.

· The jury returned a verdict for plaintiffs on their claim for $120,000, a verdict for sellers on the promissory note for $57,047.85, offset the one against the other, and returned a net verdict of $62,952.15 for plaintiffs. Judgment was entered accordingly, the court denying sellers any attorney's fees or costs on the promissory note. Following denial of the motion of sellers and Casey for judgment notwithstanding the verdict or in the alternative for a new trial, sellers and Casey appeal from such denial and from the judgment entered on the verdict.

Appellants set forth 17 issues for review phrased in terms of claimed errors in the rulings of the court at various stages of the proceedings. The basic issues are more readily understandable in the following summarized form: (1) What was the obligation of the sellers under the contract concerning the grazing preference and permit? (2) Sufficiency of the evidence to support the verdict; (3) Error in the giving or refusal of 9 jury instructions; and (4) Whether attorney's fees should have been awarded on the promissory note.

At the outset, we note that Casey and the sellers stand in identical positions with respect to plaintiffs' claim in the "main action." Casey was the president and sole owner of the Holland corporations, conducted all negotiations on their behalf,

and executed all contracts and supporting documents for them. Accordingly, sellers are bound by the acts or omissions of Casey who is responsible individually as well.

We further note that Dorothea Dooling, although not a party to the contract, is one of the makers of the promissory note. Thus she is jointly and severally liable on the note, but is not a plaintiff in the "main action" for breach of contract. By stipulation of counsel the amount awarded to sellers on the note was offset against the award to the buyers for breach of contract, resulting in a net verdict for buyers for the difference.

The first issue on this appeal concerns the obligation of the sellers under the contract with respect to waiver or transfer of the grazing preference and permit for 500 head of cattle in the Beaverhead National Forest. The gist of the controversy is whether the contract required sellers to effectively transfer this grazing permit to buyers or whether it only required sellers to execute a waiver thereof on the Forest Service form in favor of buyers.

██ ██ ˙ A contract is to be construed according to the intention of the parties at the time of contracting. Section 13-702, R.C.M.1947. If the contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible. Section 13-705, R.C.M.1947.

The contract in the instant case provided that "all of the parties hereto have reached an understanding with respect to the *sale* by Sellers and the *purchase* by Buyers of the real property, personal property, leasehold interests and *grazing permits* * * *." (Emphasis supplied) The contract further provided that "for the considerations hereinafter set forth the *Sellers agree to sell,* and the *Buyers agree to purchase,* all and singular the following described properties, to wit: * * * *Grazing Permits* Described in Exhibit 'C' hereto annexed, and made a part hereof by this reference." (Emphasis supplied) Exhibit "C" described, among other things, "United States

Department of Agriculture Forest Service Permit to graze 500 head of cattle upon the Beaverhead National Forest." Another part of the contract provided: "The Sellers agree to sell said properties, described in Exhibits 'A', 'B', and 'C', to the Buyers, and the Buyers agree to pay the Sellers therefor the sum of Nine Hundred Fifty Thousand Dollars * * *." The contract also contained the following provision: "The Sellers agree that on or before May 7, 1965, they will place in escrow with the State Bank & Trust Company of Dillon, Montana * * * a waiver of grazing preference, 4 copies, Forest Service Form 2200-12, in favor of Buyers and Dorothea M. Dooling, to the grazing permit described in Exhibit 'C'." The escrowed instruments were to be delivered to buyers upon payment of the purchase price.

At the trial the court, in effect, ruled that the contract was ambiguous with respect to the sellers' obligation concerning the grazing permit. The court permitted the introduction of extrinsic evidence to resolve this ambiguity. Section 13-713, R.C.M.1947.

This extrinsic evidence was conflicting. Where there is a conflict in the testimony as to the intention of the parties respecting an ambiguity in a contract, determination of the true meaning of the contract is one of fact for the jury. McNussen v. Graybeal, 146 Mont. 173, 405 P.2d 447. The jury resolved the ambiguity in the contract in favor of the buyers. Upon appeal, this Court will review the evidence only to the extent of determining whether there is substantial credible evidence supporting the verdict. Batchoff v. Craney, 119 Mont. 157, 172 P.2d 308; Teesdale v. Anschutz Drilling C., 138 Mont. 427, 357 P.2d 4; Greenup v. Community Transit Co., 145 Mont. 39, 399 P.2d 418.

In our view, there is substantial credible extrinsic evidence resolving this ambiguity in favor of the buyers. Plaintiffs' evidence indicated that at the inception of the negotiations, Casey showed them a Forest Service map which showed

the land covered by the grazing permit and said it would be included. Repeatedly during final negotiations, Casey assured them that the grazing permit would be transferred to the buyers and Dorothea Dooling as part of the deal. In cases of ambiguity, the language of the contract is interpreted most strongly against the party who caused the uncertainty to exist, who is presumed to be the promisor (section 13-720, R.C.M. 1947), and the language of a contract is to be interpreted in the sense that the promisor believed the promisee understood it. Section 13-715, R.C.M.1947.

Background circumstances further support the interpretation urged by the buyers. Buyers were engaged in raising cattle on a ranch adjoining sellers. The land covered by the grazing permit adjoins the land purchased by the buyers under the contract for 3 or 4 miles and cattle could pass directly from the deeded land so purchased onto the permit land. With the permit, the buyers could run 500 head of cattle for 82 days in the summer permitting them to raise more hay for winter feed on the deeded land. Without the permit, buyers found it necessary to use a hayfield on the deeded land as summer pasture which reduced their production of hay for winter feed by 500 tons. Experienced cattlemen like the buyers would not pay the same price for the deeded land *without* the permit as they would for the deeded land *with* the permit which they thought they were getting as part of the entire transaction.

For the foregoing reasons, we hold that there is substantial, although conflicting, evidence that the contract required sellers to effectively transfer the grazing permit to the buyers as a part of the total consideration for the contract.

The next issue presented for review is the sufficiency of the evidence to support the verdict. Appellants contend that there is insufficient evidence to support any breach of the contract by them or to support the amount of damages awarded to the buyers.

We hold that there is substantial credible evidence that the sellers breached the contract by failing to effectively transfer the 500 head grazing permit. The evidence is undisputed that the permit in question was a "term" permit giving the holder a preference right to annual renewals, as distinguished from a "temporary" permit which is for a single grazing season with no renewal privileges. It is also undisputed that the Forest Service did grant the buyers a "temporary" permit for the 1965 summer grazing season which was not renewed; but it is likewise undisputed that the Forest Service disapproved the transfer of the "term" permit to the buyers.

The reason for the refusal of the Forest Service to recognize the transfer of the term grazing permit is set forth in plaintiffs' Exhibit 18, a letter dated February 24, 1966 from the Acting Forest Supervisor to the buyers and Dorothea Dooling. Forest Service refusal was because the application for transfer was based upon a waiver of grazing privileges by the Holland corporations who did not hold the term permit sought to be transferred. The second transfer under the "double waiver" was not approved because the Holland corporations were not recognized by the Forest Service as permittees under the first transfer from Ellen Casey Williams. The letter concludes: "Therefore the said 'Waiver of Grazing Privileges', form 2200-12, cannot be recognized for the transfer of grazing privileges and your application for a grazing permit is disapproved."

In short, the transfer of the term grazing permit was disapproved because there was no direct waiver and transfer from Ellen Casey Williams, the holder of the grazing permit, to buyers and Dorothea Dooling. Instead there was an attempted "double waiver" and transfer through the Holland corporations which nullified the transfer.

Other testimony at the trial established that the Holland corporations were ineligible to hold the grazing permit in question under Forest Service regulations, because of facts known to Casey and undisclosed by him. One of such regula-

tions required Ellen Casey Williams to transfer to the Holland corporations the entire and identical base property owned by her upon which commensurability was based in order to make them eligible as transferees of the grazing permit. It is undisputed that Ellen Casey Williams transferred only a part of such base property to the Holland corporations. Additionally, the Holland corporations already held a grazing permit in the Toiyabe National Forest which rendered them ineligible to hold the permit in question in the Beaverhead National Forest.

Finally, Forest Service regulations required that the base property transferred by Ellen Casey Williams to the Holland corporations be held by the latter for at least one grazing season prior to transfer to the buyers and Dorothea Dooling. This, of course, directly conflicts with the terms of the contract.

■ John Jay Casey seeks to shift responsibility for these breaches of contract onto the buyers and the attorney who drafted the contract. The thrust of his argument is that he relied on the attorney, that the attorney was as much the buyers' attorney as his, and that he did everything that the buyers and the attorney requested of him.

Let us examine the evidence at the trial. There is substantial credible evidence that the "double waiver" method of handling the waiver and transfer of the grazing permit was for Casey's own tax purposes and advantage, whether conceived by the attorney, Casey, or Casey's accountant. There is also substantial credible evidence that Casey did not disclose the following facts to the attorney handling the transaction: (1) that the entire and identical base property on which the grazing permit was established was not being transferred by Ellen Casey Williams to the Holland corporations, and (2) that the Holland corporations already held grazing permits in the Toiyabe National Forest. In addition the evidence is undisputed that on the waiver forms for the transfer of the grazing permit which Casey signed appears the following language:

"CONDITIONS AND REQUIREMENTS FOR THE AP-PROVAL OF TRANSFERS OF PREFERENCES * * * "5. Failure to comply with the following requirements, without prior approval of the Forest Supervisor, may result in cancellation of the preference: * * *

"(d) Base property purchased in connection with transfer of preference must be the land actually used by the vendor as base property and must be used as base property by the purchaser one season immediately following the purchase."

Casey's own acts made transfer of the grazing permit impossible. Thus, he cannot shift the blame onto the shoulders of others and disclaim responsibility for failure of the transfer.

Appellants further contend that there is insufficient evidence to support the award of $120,000 damages. The gist of their argument is that evidence on damages is speculative and will not support any award.

The evidence on damages in this case is primarily that of John Dooling, one of the landowners, and Joe Helle, an expert witness. The owner of property can testify in a reasonable way as to its value for the use to which he is putting it. Alexander v. State Highway Comm., 147 Mont. 367, 412 P.2d 414; State Highway Comm. v. Biastoch Meats, Inc., 145 Mont. 261, 400 P.2d 274; Alexander v. State Highway Comm., 142 Mont. 93, 381 P.2d 780. This is particularly true where he is shown to have some peculiar means of forming an intelligent and correct judgment as to the value of the property in question beyond what is presumed to be possessed by men generally. State v. Peterson, 134 Mont. 52, 328 P.2d 617. Suffice it to say that John Dooling qualified under either test, his testimony was reasonable, and it supported an award in excess of the $120,000 damage award by the jury.

Joe Helle was eminently qualified as an expert appraiser of the land in question. He held a college degree in range management with a subsequent master's degree. He had been associated with ranches most of his life and had worked for

the Forest Service for six years. He had been a range conservationist in the Beaverhead National Forest and an assistant ranger in the Big Hole. He had extensive experience in land and range classification. He was a private range consultant; had done appraisal work; and had served as a commissioner in land condemnation cases.

Helle examined the land, the county classification records, determined the market value of the entire acreage by classification, examined 60 sales in the area including 20 sales in the Big Hole on which he based his valuation. He valued the hay land at $486,750, the pasture land at $238,160, the timberland at $14,400, and the state lease at $11,200, for a total of $750,510. To this he added an annual loss because of having to use hayland as pasture, due to lack of the grazing permit, capitalized this loss at 5%, and came up with a figure of $200,000. He further established a value on the land and the grazing permit at the time of contracting of $950,000 and the value of the land without the permit at $750,000. He also used a third approach to estimating damages. His overall testimony supported an award of approximately $200,000, considerably in excess of the $120,000 awarded by the jury.

For the foregoing reasons, we hold that there was substantial credible evidence supporting both the breach of the contract and the $120,000 awarded as damages.

The next issue assigned for review concerns the giving or refusal of 9 jury instructions, 5 of which were given over objection of appellants and 4 of which were instructions offered by appellants and refused by the court. We have examined the instructions given by the court over objection of appellants and find them to correctly state the law under plaintiffs' theory of the case as established by their evidence. As to the 4 instructions prepared by appellants and refused by the court, all were either covered by other instructions given or were incorrect or misleading statements of the law.

Appellants' fourth issue for review is whether an

attorney's fees should have been allowed on the $50,000 promissory note. Appellants contend that the note was past due and unpaid, that it specifically provided for a reasonable attorney's fee for collection, and that the court should have fixed such fee and allowed it as part of the setoff against the damages awarded to plaintiffs.

In the instant case the buyers and Dorothea Dooling admitted liability on the note, claimed that a greater amount was owing them as damages by the payees on the note, and sought to credit the amounts owed by them on the note against the damages they suffered. The jury verdict did just that. Under such circumstances, the trial court was correct in refusing any award of an attorney's fee on the note. Gilliland v. Rodriquez, 77 Ariz. 163, 268 P.2d 334; Oklahoma State Union of F. E. & C. Union of America v. Keathley, (Okl.1955), 291 P.2d 1031; Wagner & Chisholm v. Dunham, (Tex.Civ.App.1923), 246 S.W. 1044; 41 A.L.R.2d 677. The following language of the Utah Supreme Court in Nalder v. Kelogg Sales Company, 6 Utah 2d 367, 314 P.2d 350, expresses our thoughts:

"As to the allowance of attorney fees, we hold the better rule to be that where the makers of a past-due note providing for attorney fees on the amount found due sue the payee for damages and recover a judgment for a sum greater than the amount awarded to the payee on a counterclaim in the action, that no attorney fees should be allowed on the counterclaim."

We have examined all other arguments raised by appellants and find them to be without merit. The judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES ADAIR, CASTLES and JOHN C. HARRISON, concur.