No. 83,919

CITY OF WICHITA, KANSAS, *Appellant,* v. VICTOR B. EISENRING and JOHNNIE B. EISENRING, *Appellees,* and AMERICAN NATIONAL BANK OF WICHITA, *Appellee.*

(7 P.3d 1248)

Opinion filed July 14, 2000.

*David M. Rapp*, of Hinkle Elkouri Law Firm, L.L.C., of Wichita, argued the cause, and *Roger M. Theis*, of the same firm, was with him on the brief for appellant.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, argued the cause, and *Kathryn Gardner*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

Davis, J.: Through eminent domain, the City of Wichita (City) acquired 75.9 acres of real estate owned by Victor B. and Johnnie B. Eisenring. The City appeals from the jury determination of market value, claiming that the award was based upon expert testimony erroneously admitted without adequate foundation and, further, improperly based upon consideration of personalty located on the Eisenring property. We affirm.

Victor and Johnnie Eisenring, husband and wife, owned a 75.9 acre tract of land which the City sought to acquire by eminent domain in order to construct a new water plant. As required by statute, the court appointed a panel of appraisers to value the property. The report of appraisers concluded that the value of the property was $500,000.

The Eisenrings appealed to the district court from the award and requested a jury trial to determine compensation and damages. A trial on damages was held from June 29 to July 2, 1999.

A detailed statement of facts regarding opinion testimony on the market value of the property taken is necessary to address the City's claims of error. Victor Eisenring testified that he had purchased the property in about 1976 and had obtained a conditional use permit to extract sand and gravel from the property. Eisenring stated that the property contained good building sand and gravel

to the 45 foot level or deeper. While the conditional use permit allowed Eisenring to mine up to 46.7 acres of the property, he had only mined around 6 acres by 1998. Eisenring explained that he was 81 years of age and did not want to operate the sand pit as an every-day operation. Instead, starting in about 1990, he mined only enough sand to make a good living, about an acre or less a year. He did not search out additional business because he did not want to work more than he did. He noted that two other operations were selling between 200,000 to 300,000 tons of sand and gravel per year.

Eisenring also operated a rock crusher on the property and allowed road contractors to dump their used and broken concrete rubble on his property which he would then crush and sell to the contractors as a base material. He estimated there were 45,000 tons of uncrushed rubble on the property as of the date of the taking. According to Eisenring, he crushed the concrete on his property, thereby making it valuable, and the value would be significantly reduced if it had to be removed from his property.

Eisenring admitted that his conditional use permit did not permit the crushing of rock. However, he testified that he had obtained a permit from the county to do so with regard to a highway project and had continued to crush the rock. Neither the City nor the County had ever indicated that he was not allowed to continue the crushing of rock on the property. In fact, counsel for the City expressly told him that he could continue to crush the rock.

Eisenring testified that the land would produce between 2 to 3 million tons of gravel and sand. After the gravel and sand were exhausted, the sand pit would be a lake and the remaining portion of the tract could be used for residential homes. Eisenring testified that there was a large amount of residential development in the immediate area. Some land in the area had recently been sold for in excess of $20,000 per acre.

Eisenring testified that in 1993, he had filed a financial statement valuing the tract of land at $450,000. However, he explained that this was before the growth of residential development in the area. In 1995, his financial statement listed the property at $780,000. He valued his property at $10,000 per acre, for a total of $759,000.

On cross-examination, Eisenring admitted that his sales and revenue from the property from 1993 to 1997 reported for income tax purposes were as follows:

| Year | Gross Sales | Net Profit or (Loss) |
|------|-------------|----------------------|
| 1993 | $219,480 | ($17,140) |
| 1994 | $284,015 | $261 |
| 1995 | $166,795 | ($47,000) |
| 1996 | $ 97,718 | ($49,182) |
| 1997 | $167,522 | ($36,613) |

However, Eisenring testified that once he learned of the City's plan to condemn his land in 1995, he had significantly decreased production because he did not want to assume any long-term contracts he could not complete. He further testified that his lack of profitability was by his own choice in operating the sand pit in the manner in which he did.

Eisenring also admitted that he had at one point told the appraisers that he could buy sand cheaper than he could produce it. However, he stated that this comment was made in reference to the fact that if the job was not nearby it was cheaper to buy sand and gravel closer to the site than to produce and haul the sand and gravel from his site.

David Stannard, a highway paving contractor, testified in support of the Eisenrings. According to his calculations, the volume of useable sand and gravel to be produced from the area would be between 3,494,400 and 4,000,000 tons. He testified that the land should be valued at $10,000 per acre, for a value of $759,000.

Sherry Evans, a real estate broker, testified on behalf of the Eisenrings. She testified that she had listed the property in 1990 for $500,000 when it was vacant land without the lake created by the sand operation. She also testified that a piece of property nearby sold for $22,000 per acre. According to Evans, the Eisenrings' land should be valued at $10,000 per acre, considering the great amount of residential development in the area, for a total value of $759,000.

Ray Scadden, a real estate appraiser, also testified on behalf of the Eisenrings. He stated that he had appraised the property in

1990 for $401,443. Scadden testified that the value of the property had increased since then due to the residential development in the area. In Scadden's opinion, the highest and best use of the property would be for the production of gravel and sand, with residential use following the depletion of the gravel and sand.

In reaching his opinion, Scadden considered both the income and market data approaches to value. In utilizing the income approach, he obtained some information from Eisenring as well as from some competitors. He determined that the remaining 43 acres of Eisenring's property would yield 4,437,600 tons of sand and gravel. Competitors sold sand and gravel from $1 to $2.42 per ton. Utilizing the lowest price of $1 per ton, he concluded that over 5 years, the yearly estimated income would be $887,520. From information supplied by Eisenring, he concluded yearly expenses would be $122,547, leaving a net income of $764,973. This led him to place a value on the property of $714,973. He did not appraise the concrete rubble, but instead assumed it would be removed from the property.

Scadden also valued the property using the income method, assuming that the owner merely optioned the property to an operator and took a royalty income of 14¢ to 16¢ per ton. He estimated the value under that method to be $668,118.

Finally, Scadden appraised the property using the market data approach. He found that the property was most like neighboring property which had sold for $8,603 per acre. He opined that the property should sell for $8,300 per acre for a total value of $629,970. Scadden acknowledged that the market data approach is a more concrete approach to value than is the income approach.

Commercial real estate appraiser F. Lee Jones testified on behalf of the Eisenrings. After extensive evidence relating to his qualifications, Jones testified that he valued the property using the income method. In performing his analysis, he used 46.7 acres as the amount of sand and gravel that could be taken from the property which left 29.2 acres for development. He obtained a list of product prices from the Eisenrings' competitors and used an average per ton figure of $1.66. He calculated that 4,432,230 tons of product remained and that it could be sold at 200,000 tons per year for 22

years. He also calculated one year of crushed concrete production to use up the concrete on the site. He determined that for the first year of operation, the property would yield $669,500 in gross income, with $337,500 of that income from the crushed concrete. Thereafter, the property would yield $332,000 per year in gross income from the sand and gravel for 21 years. Jones was unable to obtain expense figures from the Eisenrings' competitors, so he used figures from Meier's Sand Company in Topeka, Kansas, which operates 11 sand pits across the state. According to Jones, utilizing an 11% capitalization factor, the present value of the income from the land over the 22 years would be $1,129,081, and at that time the property could be used for residential purposes with a value of $59,275.65. Thus, Jones opined that the property was worth $1,188,000. Without the concrete figured in, the value of the property under the income method would be $913,000.

Jones also performed an appraisal using the market data approach and valued the land under that approach at $7,900 per acre, or approximately $600,000.

On cross-examination, Jones admitted that he had obtained the amount of sand and gravel by assuming that the whole 40.7 acres could be mined straight down when, in fact, the conditional use permit called for a slope. Jones stated that he had not done the calculation with a slope.

The City presented the testimony of appraiser James L. Gardner, II. Gardner stated that he had originally been employed by the Eisenrings' attorney to value the property. He had used a market data approach to value the property at $6,250 per acre, or $475,000 as a whole. He used an income approach to value the property at $751,670. Gardner testified that the disparity indicated to him that the property was worth more than the straight market data approach showed and using his expertise, he opined that the actual value of the property was $525,000.

Gardner also testified that he had calculated the amount of sand and gravel to be extracted as if the property could be mined straight down. He explained the fact that the property had to be mined on a slope would not affect his overall estimation of the value, as the

loss in sand and gravel would be offset to a large extent by the use of a shorter period of time to extract it.

The City also presented the testimony of commercial real estate appraiser Steve Martens. Martens stated that the highest and best use of the property was solely for residential development. Under the market data approach, Martens valued the property at $5,000 per acre for a total of $380,000.

The jury returned a verdict valuing the property at $767,250. The City filed a motion for a new trial which was denied. The City appealed the verdict to the Court of Appeals. The matter was transferred to this court pursuant to K.S.A. 20-3018(c).

## Discussion

The City contends that the district court permitted the property owners to "put forth expert valuation testimony which disavowed the known facts and history of the property and instead relied on speculative assumptions without basis in the evidence." In addition, the City claims that the evidence admitted without adequate foundation resulted in the "jury's exercise of a standardless [sic] discretion in assessing the valuation of the property." The argument of the City involves the income method of appraisal and the relief requested by the City is that this "court . . . set standards to limit the unchecked use of the income approach."

## Eminent Domain Fair Market Valuation: Standard of Review

Eminent domain is not a civil action but rather a creature of statute. Those exercising the right of eminent domain "shall exercise such right in a manner set forth in K.S.A. 26-501 to 26-516, inclusive." K.S.A. 26-101. The major issue in a condemnation action is the condemned property's fair market value. 5 Nicholls on Eminent Domain §18.05[1] (3d Ed. 1997). Thus, any competent evidence bearing upon market value generally is admissible including those factors that a hypothetical buyer and seller would consider in setting a purchase price for the property. 5 Nicholls, §18.05[1]. Considerable discretion is vested in the trial court in admitting or rejecting evidence of value, and the latitude accorded to the parties in bringing out collateral and cumulative facts to

support value estimates is left largely to the discretion of the trial court. 5 Nicholls, §18.05[1]. See *City of Shawnee v. Webb*, 236 Kan. 504, 511, 694 P.2d 896 (1985).

Evidence in an eminent domain proceeding consists mostly of the opinions of witnesses who are sufficiently well informed on the subject to be helpful and informative to the jury. Such evidence is allowed because the valuation of real estate is largely a subjective matter and cannot be definitely determined by the application of any exact principle of science. 5 Nicholls, §18.15.

The measure of compensation in an eminent domain proceeding in which an entire tract of land is taken is the fair market value of the property or interest at the time of the taking. K.S.A. 1999 Supp. 26-513(b). There are three generally recognized methods of valuing real estate: (1) cost approach—the reproduction cost of the property at the time of taking less depreciation; (2) market data approach—the value of the property based upon the recent sales of comparable properties; and (3) income approach—the capitalization of net income from the property. See *State Highway Commission v. Lee*, 207 Kan. 284, 299, 485 P.2d 310 (1971).

Prior to 1999, Kansas did not statutorily define fair market value. Compare K.S.A. 26-513 with K.S.A. 1999 Supp. 26-513. However, factors dealing with the ascertainment of the amount of compensation and damages to be paid to the owner were set forth by statute. K.S.A. 26-513(d). Considerable case law developed over the years in Kansas regarding fair market value in condemnation actions. The favored approach to valuation in Kansas was the market data approach. Comparable sales of property in the same vicinity and with similar characteristics usually resulted in a very accurate reflection of the fair market value of the property taken. Judicial preference of the market data approach was well established in this state. See *Ellis v. City of Kansas City*, 225 Kan. 168, 172, 589 P.2d 552 (1979); *Reiter v. State Highway Commission*, 177 Kan. 683, 687-89, 281 P.2d 1080 (1955).

On the other hand, because of its sometimes speculative nature, the income approach was generally strictly limited to cases where it was difficult if not impossible to use the market data approach. See *Ellis v. City of Kansas City*, 225 Kan. at 173; *State Highway*

*Commission v. Lee*, 207 Kan. at 299; *Eisenring v. Kansas Turnpike Authority*, 183 Kan. 774, 779-80, 332 P.2d 539 (1958).

The modern approach in condemnation actions, however, recognizes all three methods and allows the income approach to be used even where comparable sales exist. See 5 Nicholls, § 19.01[2]. See also *Denver Urban Renewal Auth. v. Berglund-Cherne Co.*, 193 Colo. 562, 568 P.2d 478 (1977). In *Denver Urban Renewal Auth.*, the court stated, in adopting the modern rule:

"The approach which we have elected to follow takes into account the practice followed by appraisers in preparing an opinion as to value. Appraisers do not adopt an isolated approach to reach an opinion as to value, but attempt to utilize all three approaches to test the validity of their conclusion as to the fair and actual cash market value of the property to be condemned. Opinion evidence as to value requires that the unique and different characteristics of every individual piece of property be analyzed for its comparability to other property that bears comparable characteristics. Factual circumstances may cause one approach to valuation to be more appropriate than another. Rarely are two pieces of real estate identical, and usually each parcel of real property has advantages and disadvantages which are not possessed by another. No purpose is served by limiting testimony to one approach or to the most appropriate method of attaining an opinion as to value. Recognition should be given to all relevant factors which tend to provide a means for arriving at a fair evaluation." 193 Colo. at 566.

Consistent with this modern rule, the Kansas Legislature in 1999 amended the provisions of K.S.A. 26-513 by acknowledging that fair market value is determined by utilizing the three common methods or any combination of the methods. See K.S.A. 1999 Supp. 26-513. K.S.A. 1999 Supp. 26-513(e) now provides:

" 'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. *The fair market value shall be determined by use of the comparable sales, cost or capitalization of income appraisal methods or any combination of such methods.*" (Emphasis added.)

Thus, by virtue of the amendment, all three methods stand on equal footing. Our legislature has substantially modified the settled rule of judicial preference for the market data approach. The suspicion and skepticism expressed in the past with the income approach is no longer justified.

The arguments advanced by the City in its first assignment of error deal exclusively with the admissibility of evidence regarding the fair market value of the property taken. The City questions the .foundation for admitting expert opinion testimony as to the fair market value of the property taken. Relying upon past decisions of this court regarding proper foundations when utilizing the income valuation approach, the City argues that certain testimony was admitted which should have been excluded for lack of foundation.

Care must be taken not to engage in the preexisting judicial preference for market data approach and to refrain from applying the type of scrutiny arising out of such a preference. The law governing disposition of this first claim of error requires no more scrutiny than a trial court would require in dealing with any expert opinion offered in support of either party's theory of the case. The law in this state regarding expert testimony is a familiar one:

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." K.S.A. 60-456.

The qualification of an expert witness as well as the admissibility of expert testimony are matters within the broad discretion of the trial court. The admissibility of expert testimony is a matter to be determined by the trial court in the exercise of its discretion. The trial court's determination will not be overturned absent an abuse of such discretion. *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 762, 915 P.2d 86 (1996). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. *Simon v. Simon,* 260 Kan. 731, Syl. ¶¶ 1 and 2, 924 P.2d 1255 (1996).

## Arguments of the City

It must first be observed that the City participated in the instructional conference and did not object to the detailed instructions given to the jury regarding matters which may be considered in

arriving at a determination of the fair market value of the property taken. Secondly, the value finally arrived at was not the highest or lowest figure but rather approximated a mean figure. Instruction No. 10 given to the jury summarized the market value as found by the witnesses:

| "Victor B. Eisenring | $ 750,000 |
| Dave Stannard | $ 759,000 |
| Sherri Evans | $ 759,000 |
| Ray Scadden | $ 629,970 |
| F. Lee Jones | $1,000,000 |
| James Gardner | $ 525,000 |
| Steve Martens | $ 380,000" |

The jury returned a verdict valuing the property at $767,250. Thus, it appears that the jury was given the correct standards and guidance to follow in determining the fair market value of the property taken.

Nevertheless, the City argues that evidence regarding the use of the income approach should not be admissible without a reliable evidentiary foundation based on facts and admissible evidence. In support of this contention, the City cites several cases from outside this jurisdiction: *United States v. 47.14 Acres of Land, etc.*, 674 F.2d 722 (8th Cir. 1982); *United States v. Whitehurst*, 337 F.2d 765 (4th Cir. 1964); and *State Highway Comm'n v. Bare*, 141 Mont. 288, 377 P.2d 357 (1962), as well as a federal case from Kansas, *United States v. 1,197.29 Acres*, 759 F. Supp. 728 (D. Kan. 1991).

In *47.14 Acres of Land*, the 8th Circuit Court of Appeals reversed an award established by the income method where there was no evidence as to the future demand for the minerals produced or a showing of reasonable probability that the land could be used for mineral production. The court stated:

"[T]he capitalization of income method may be appropriate in certain cases, but where such method is used all of the factors that must necessarily be taken into account should be established by proper evidence. Where several of the elements or factors relied on by the commission are without objective evidential support, that method is faulty and can obviously lead to unfounded and enhanced valuations. Again, it appears clear that comparable sales are the best evidence of the value of condemned land, which sales on the whole reflect the principle of a

willing seller and a willing buyer concluding arms-length negotiations. The income capitalization method is justified mainly when better evidence is not available. Great care must be taken, or such valuations can reach wonderland proportions. It is necessary to take into consideration manifold and varied factors, like future supply and demand, economic conditions, estimates of mineral recoverability, the value of currency, changes in the marketplace, and technological advances. Many of these factors are impossible to predict with reasonable accuracy." 674 F.2d at 726.

Two of the other cases cited by the City reach similar conclusions. See *Whitehurst*, 337 F.2d at 775-76 (holding that the factors relied on in using the income method cannot be based on pure speculation without objective evidential support); *Bare*, 141 Mont. at 300-01 (use of the income method must be based on figures which have a foundation). The federal district court case from Kansas, *1,197.29 Acres*, is of less value, although the court in that case did note that while a qualified witness may give his or her opinion of the value of the property, the opinion " 'must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption.' (Citations omitted.)." 759 F. Supp. at 733.

The City argues that the foundation for the income method appraisals done by the Eisenrings' experts were deficient because: (1) Jones incorrectly and without facts assumed that the production would double to 200,000 tons and that such a demand would exist and continue undiminished for 22 years; (2) cost information from Meier's Sand Company in Topeka was used without any evidence that it was comparable to costs in the Wichita area; (3) there was no evidence regarding Jones' use of 11% as the capitalization rate; (4) the quantity of extractable material was overestimated by the experts; and (5) the royalty valuation was speculative. The City argues that the trial court should have refused to admit the testimony because of an inadequate foundation.

The rule in Kansas with regard to eminent domain proceedings is:

"[O]nce a witness has qualified as an expert land appraisal witness in a condemnation action, the court cannot regulate the factors he uses or the mental process by which he arrives at his conclusion. These matters can only be challenged by cross-examination testing the witness' credibility." *Board of Sedgwick County Comm'rs v. Kiser Living Trust*, 250 Kan. 84, 96, 825 P.2d 130 (1992).

Accord *Hudson v. City of Shawnee*, 246 Kan. 395, 407, 790 P.2d 933 (1990); *McCall Service Stations, Inc. v. City of Overland Park*, 215 Kan. 390, 400, 524 P.2d 1165 (1974).

The above rule is somewhat limited by the fact that "the responsibility of defining the extent of compensable right is in the courts and if it is established that value testimony was based on noncompensable items or the credibility of the testimony is otherwise destroyed the testimony should be stricken in response to a proper motion." *Morgan v. City of Overland Park*, 207 Kan. 188, 190, 483 P.2d 1079 (1971). See *Board of Sedgwick County Comm'rs*, 250 Kan. at 96. In *Board of Sedgwick County Comm'rs*, we held that the trial court did not abuse its discretion in refusing to allow an expert's testimony regarding the value of the land using the cost approach to value because it was without adequate foundation. 250 Kan. at 96. However, we did so because even though the expert used the cost approach, which is defined as the "cost to acquire the land and build equivalent improvements less depreciation," the expert was unable to break down his before and after values of the property into separate components of land, replacement cost of the improvement, and depreciation, which he was required to do. See 250 Kan. at 95-96.

Unlike the expert opinion in *Board of Sedgwick County Comm'rs*, the credibility of the expert opinions in this case were not destroyed by complaints of alleged speculation. Rather, the trial court's ruling was a sound exercise of discretion. The City complains that Jones' opinion was speculative with regard to the potential income from the property, especially in comparison with the amount of income produced from the property in the years prior to the taking. However, it is clear from the facts that Eisenring underutilized the property. Eisenring testified that at age 81, he did not care to work the sand pit every day and extracted only the amount of sand necessary to make a good living. While it is true that from a financial standpoint Eisenring's business was not doing well, the evidence shows that the majority of the reasons for this could be attributed to the manner in which Eisenring chose to work the property and was not necessarily indicative of the property's income-producing potential.

Further, while appraiser Jones did not directly introduce facts which would prove that operations on the property would be capable of producing 200,000 tons per year, or that a market would exist for such production, he testified that other operators in the area were producing at least 200,000 tons per year and that the high rate of construction in the area would create a need for the product. Jones testified that in calculating the income stream from the property, he looked at prices charged by six northwest Wichita sand and gravel producers. His report provided a detailed price analysis for road gravel, concrete and FA-1 sand, mason's sand, fill sand, B-2 sand, fill dirt, mud balls, topsoil, sandy loam, and crushed concrete from these suppliers.

The City also complains that rather than using actual past figures from Eisenring's operation to calculate projected expenses, Jones instead "chose to rely on an expense list faxed to him from a person at Myers Concrete [Meier's Sand Company] in Topeka, a sand and gravel operator." Once again, however, it is clear from the evidence that Eisenring's past expenses would not necessarily be helpful due to his underutilization of the property. Jones testified that he attempted to gain expense information from other sand and gravel operators in the area but could not because they were not eager to share that information. Therefore, he chose to rely on the information from Meier's Sand Company. We cannot say that this reliance was unreasonable.

The City further complains that Jones provided no foundation for his reliance on an 11% capitalization rate and that appraiser Scadden provided no foundation for his use of the 14¢ royalty rate. However, Jones detailed that common capitalization rates for well-grounded investment properties were between 8.5 and 12%. The City made no objection to this rate, and we cannot say that his use of 11% was unreasonable or unduly speculative. The same may be said for Scadden's estimate of the royalty rate.

Finally, the City complains that both Jones and Scadden estimated the amount of extractable sand and gravel by assuming that the property could be mined straight down rather than at a slope as required by the permit, thus rendering the opinion without basis. However, it should be noted that this calculation was also used by

one of the City's witnesses who testified that such use would have little impact on the final value.

Ultimately, it is clear that both Jones and Scadden were, without question, qualified as experts in the field of property appraisal. As such, the mental processes and factors which they used to formulate their expert opinions could only be tested on cross-examination. The trial court carefully monitored their testimony, excluding any evidence which it found to be without foundation or speculative. The alleged foundational deficiencies complained of in this appeal were all of a type which could be tested on cross-examination and which a reasonable jury could have considered in finding value, rather than of a type which would completely undermine the credibility of the opinion. We conclude that the City did not meet its burden in establishing that the trial court abused its discretion in allowing the Eisenrings' expert testimony.

The City also argues that the Eisenrings' experts' use of the expense list from Meier's Sand Company, as well as the use of the royalty rate which was determined from calling other producers, constituted the use of inadmissible hearsay and should have been excluded by the court. In the case of *In re Watson*, 5 Kan. App. 2d 277, 278-79, 615 P.2d 801 (1980), the Court of Appeals held that an expert opinion of a parent's ability to change her parenting skills that was based on tests not admitted into evidence was inadmissible as hearsay. In reaching this conclusion, the Court of Appeals cited *Mesecher v. Cropp*, 213 Kan. 695, 701-02, 518 P.2d 504 (1974). In *Mesecher*, an examining physician was not allowed to testify about findings made in a neurosurgeon's report. 213 Kan. at 702. However, *Mesecher* does not support the proposition that an expert's testimony based on hearsay is not admissible. *Mesecher* concerned only the admission of the neurosurgeon's report, not its use by the expert to form the basis of his opinion. We explicitly noted that "Dr. Starkey did not claim to base his opinion on the facts or data in the [neurosurgeon's] report." 213 Kan. at 702.

The hearsay rule's application is limited with regard to expert testimony in eminent domain cases. In *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 547-48, 431 P.2d 518 (1967), we held that the trial court erred in excluding an expert's opinion that was for the

most part based on market research data and trade journals. We noted:

"Value in the business sense consists largely of the opinions of persons familiar with the market, and those opinions are largely what is said and reported by others. Trade journals are generally recognized sources of information covering values, and the record contains testimony to that effect. When an expert witness testifies as to value, relying in part on market data and trade journals, such data and journals do not have to be admitted in evidence before his testimony is admissible. (Citations omitted.) The fact that [the expert] consulted market research data and quotations in trade journals as a source of knowledge of the value in 1963 did not render his opinion in admissible under any exclusionary rule, nor was it hearsay."

The rule in *Casey* is consistent with the general rule regarding expert testimony that "[i]nformation acquired from others, though generally not admissible as an independent fact, may be sufficient to qualify an expert and to supply a partial basis for his opinion." 5 Nicholls on Eminent Domain, § 23.07 (3d ed. 1997). See also *H. & H. Supply Co. v. United States*, 194 F.2d 553, 556 (10th Cir. 1952) (holding that "[t]he rule is well established that an expert may testify as to value, though his conclusions are based in part, or even entirely, upon hearsay evidence"); *United States v. Sowards*, 339 F.2d 401, 402 (10th Cir. 1964) (stating that "[a]s a general rule, an expert may testify as to hearsay matters, not to establish substantive facts, but for the sole purpose of giving information upon which the witness relied in reaching his conclusion as to value").

It has been held that in some cases this rule is limited to such facts or data that are generally and reasonably relied upon by experts in the particular field in forming opinions or drawing inferences upon the subject. 5 Nicholls, § 23.07. This is consistent with *Casey*. See 199 Kan. at 547.

The Eisenrings' experts obtained certain necessary information regarding the gravel and sand business by contacting other producers in the same business. Consistent with the general rule, we conclude that reliance on such information was reasonable for the expert witnesses in the case we now consider. Thus, the admission of an opinion partially based upon such information relates to the weight of the evidence rather than admissibility.

The City's final contention is that the trial court erred in allowing evidence regarding the value of concrete rubble on the property. The City contends that the concrete rubble was not a fixture on the property but was instead personal property subject to removal and therefore could not be considered by the jury in affixing damages. The trial court, over the City's objection, allowed appraiser Jones to include in his income calculations regarding the value of the property the value of the concrete rubble which was then on the Eisenrings' property awaiting crushing and selling.

Generally, the value of personal property is not included in the value of the land unless the property is a fixture. See 2 Nicholls on Eminent Domain, § 5.03[5][c] (3d. ed. 1997). In *U.S.D. No. 464 v. Porter*, 234 Kan. 690, 676 P.2d 84 (1984), we addressed the question of the whether the trial court erred in instructing the appraisers not to take into account the value of a propane tank and equipment on the property. We held that whether a piece of property is a fixture is a question of fact. 234 Kan. at 694-95. The general rule is that the status of a particular object is a mixed question of law and fact, and unless the facts are susceptible to only one inference, the question should be resolved by the trier of fact. See 35 Am. Jur. 2d, Fixtures § 75.

The City argues that the trial court erred in allowing evidence of the value of the concrete rubble to be admitted because the rubble was not a fixture. The problem with the City's argument is that it is not clear that the trial court actually held that the rubble was a fixture. Prior to trial, the City filed a motion to exclude the evidence. However, the trial court's ruling on the motion is not in the record on appeal. Both parties appear to take the position that the motion was denied by the court, but without the actual trial court's ruling, it is impossible to determine what factors the court actually considered. We note that there is some evidence in the record to support the classification of the rubble as a fixture on the property, but without a definite ruling from the trial court to that effect, we hesitate to do so.

Further, it is not clear the jury considered the value of the concrete rubble in determining the value of the property. Victor Eisenring testified that he planned to remove the concrete from the

property. Only appraiser Jones explicitly considered the value of the concrete in his calculations and even he provided two separate calculations. His estimated values of $1,188,000 with the concrete and $913,000 without the concrete were significantly higher than the figure the jury actually awarded, which tends to support the inference that the concrete was not considered by the jury in reaching its verdict.

The City has the burden of furnishing a record which affirmatively shows that prejudicial error occurred. See *McCubbin v. Walker*, 256 Kan. 276, 295, 886 P.2d 790 (1994). Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal. *Smith v. Printup*, 254 Kan. 315, 353, 866 P.2d 985 (1993). In the absence of such a record, we presume that the action of the trial court was proper. *State v. Moncla*, 262 Kan. 58, 68, 936 P.2d 727 (1997). The record in this case fails to support the City's claim of error, and the City's argument fails.

Affirmed.