No. 102,163

KANSAS CITY MALL ASSOCIATES, INC., *Appellant*, v. THE UNIFIED
    GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS,
    *Appellee*.

(272 P.3d 600)

Opinion filed
March 16, 2012.

*Douglas J. Patterson,* of Property Law Firm, LLC, of Leawood, argued the
cause, and *Joseph R. Borich III,* of the same firm was with him on the briefs for
appellant.

*Paul G. Schepers,* of Orrick & Associates, L.L.P., of Overland Park, argued the
cause, and *Timothy P. Orrick,* of the same firm, was on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is an appeal from an award of compensation in an eminent domain action. Kansas City Mall Associates, Inc. (KC Mall), the owner of what was once the Indian Springs Shopping Center in Kansas City, argues that the district court erred by admitting evidence from a 2005 tax appeal as well as certain testimony and reports from appraisal experts for the condemning authority, the Unified Government of Wyandotte/County, Kansas City, Kansas (Unified Government). We are not persuaded by KC Mall's arguments and affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

KC Mall initiated review of the court-appointed appraisers' award of $7.5 million for the subject property, renamed Park West Business Center by KC Mall. The date of the taking was June 20, 2007. The 57.38-acre property underlies the main mall structure and four outbuildings, including a dental office that once housed Brotherhood Bank, an old Franklin Bank building, and two auto repair shops.

KC Mall filed a motion in limine to exclude 2005 tax appeal documents filed by Joseph Kashani, the president of KC Mall, for four of five parcels that make up the subject property. In the tax appeal, Kashani estimated the value of the main mall at $1.5 million, the value of the former Dillard's that was part of the main mall at $1 million, the former Franklin Bank building at $100,000, and the former Brotherhood Bank building at $50,000. KC Mall's motion argued that it had filed the 2005 appeal only to force the Unified Government to abide by a Neighborhood Revitalization Plan. The plan was supposed to freeze property taxes for 10 years, starting in 1998; but the Unified Government raised the tax on the property in 2005. In the alternative, KC Mall argued that the "unit rule" prohibited admission of the tax appeal documents because they addressed only components of the property and not the entire tract.

In its response to KC Mall's motion, the Unified Government argued that the 2005 tax appeal documents constituted admissions against interest needed to combat Kashani's anticipated testimony

that he believed the value of the property to be $30 million to $35 million. In addition, the Unified Government contended that the tax appeal had nothing to do with the revitalization plan; rather, it was prompted by a reduced income stream from the subject property. Finally, the Unified Government argued that admission of the tax appeal documents would not violate the unit rule, because evidence of the separate values of pieces of the entire tract could be considered, as long as the award of just compensation did not ultimately assign separate values to component parts.

The district court denied KC Mall's motion in limine.

After this ruling, the Unified Government asked the district court to clarify whether the documents were admissible as substantive evidence as well as impeachment, in the event Kashani testified about his opinion of value. The Unified Government also argued that it should be entitled to call Kashani during its case-in-chief to impeach his valuation testimony. In response to these arguments, District Judge Philip L. Sieve held that the tax appeal documents were admissible as substantive evidence as well as for purposes of impeachment, relying on *City of Wichita v. Sealpak Co.*, 279 Kan. 799, 112 P.3d 125 (2005). Judge Sieve also granted KC Mall a continuing objection on the issue of the documents' admission. KC Mall's lawyer stated that he would put Kashani on the witness stand at trial and that Kashani would testify about his opinion on value only because of Judge Sieve's ruling.

When trial began, Kashani was KC Mall's first witness. He testified that the Kashani family owned KC Mall and that he was the president and chief financial officer of the company. The Kashanis formed KC Mall to purchase the Indian Springs Shopping Center in 1995 with the intention of rehabilitating it. KC Mall brought in governmental agencies to lease some of the mall space, as well as the dental office and a telemarketing company. To cement the deal with the telemarketing company, KC Mall negotiated the tax rebate that was part of the revitalization plan.

In 2005, KC Mall applied to the Unified Government to change the zoning of the property from retail to business park, and the application was granted. By late 2006, KC Mall had changed the

signage on the subject property to read: Park West Business Center.

Kashani concluded his direct examination without giving his opinion on the value of the property. On cross-examination, however, he testified that he believed the value of the property was $30 million to $35 million. Kashani also was cross-examined about 2005 tax appeal documents, which the court admitted. The information in the documents included both the assessed value and Kashani's statements of value for purposes of the appeal. Kashani also admitted that the total 2005 value he placed on the parcels for the tax appeal was $2.65 million, and he admitted that, during an earlier bankruptcy proceeding, he had given a high vacancy rate as the reason for the tax appeal.

On redirect, Kashani described several motives for the tax appeal: damage to an old Montgomery Ward space; a high vacancy rate; and a 96 percent increase in property taxes from 2004 to 2005, which he believed to be contrary to the agreement for a tax rebate under the revitalization plan. He also testified that he pursued the tax appeal without the benefit of legal advice.

KC Mall next called two appraisal experts. Peter D. Burgess, MAI, testifying that the highest and best use for the subject property was as a business park, stated that the land alone was worth $7.5 million and that he estimated the fair market value of the whole property at $15 million. Douglas L. Harris testified that the value of the subject property was $16.765 million.

KC Mall called four other experts in support of its plan to develop the subject property under business park zoning. The witnesses included an appraiser who discussed the conversion of "dead" malls to other uses, an architect who worked with KC Mall to come up with the business park idea and assisted with its successful rezoning effort, a broker who discussed KC Mall's leasing efforts, and a landscape architect who testified that recycling the retail space into a business park was consistent with industry practice.

For its part, the Unified Government called two witnesses: Robert E. Marx and Kevin Nunnick, both appraisal experts. The district

court admitted their appraisal reports as well as their testimony about their methods and conclusions.

Marx first testified that the steps to determine the highest and best use of the subject property should include examination of whether a use was physically possible; legally permissible, that is, properly zoned; financially feasible; and maximally productive, that is, likely to generate the highest possible return on investment for the owner. He further testified that the determination of the highest and best use affects the type of comparable properties an appraiser considers in his or her valuation.

According to the record before us, Marx's testimony about the highest and best use for the subject property was inconsistent. On direct examination, he opined that the highest and best use was to maintain the existing buildings on the property and use them as parts of a business park. When KC Mall objected to Marx's testimony based on use of operating malls as comparable properties, Marx testified on voir dire—outside the presence of the jury—that the highest and best use of the subject property was part office, part retail. On cross-examination, once again before the jury, Marx conceded that none of the mall properties he had used as comparables had been converted to business parks, and he said that he had not sought sales of business parks for purposes of comparison. He then contradicted himself, first testifying that he considered the highest and best use for the subject property to be a mall and then that he believed it to be a business park.

Marx's report stated that the highest and best use for the property was as "vacant (business park of mixed-commercial use)" and "as improved (enclosed mall and 4 outbuildings, maintain current use)."

Marx valued the land alone at $4.4 million, comparing it to other land sold in Wyandotte County. Marx said that he considered all three statutory valuation methods for the entire tract—cost, capitalization of income, and comparable sales—but he arrived at values only under the capitalization of income and comparable sales approaches.

Under the capitalization of income approach, Marx concluded that the fair market value of the subject property at the time of the

taking was $4 million. He used data on operating expenses from Bannister Mall and Blue Ridge Mall.

Under the sales comparable sales approach, Marx testified that he had found comparable sales of four malls outside the Kansas City area. The four sales prices ranged from $2.5 million to $8.8 million, and Marx calculated the price per square foot at $4 to $5. This gave him an ultimate fair market value for the entire subject property of $3.7 million to $4.5 million.

On the subject of zoning, Marx's report indicated that the zoning of the subject property was "planned limited business" and that the development of the site was consistent with the zoning ordinance. Marx testified that the zoning of a property should not affect demand. For example, a tenant looking for office space would not look at a retail building. On cross-examination at trial, Marx admitted that retail was not a permitted use for property zoned as a business park. He also conceded that none of the malls from which he drew data were later converted to business parks and that he had sought comparable sales of old malls rather than business parks.

Nunnick testified consistently that, in his opinion, the highest and best use for the subject property was retail and redevelopment. Specifically, Nunnick testified that it was legally possible at the time of the taking to use the property as a business park, given its zoning. But it was not physically possible or economically feasible to use the property as a business park, because the buildings were still set up for and operating as retail; tenants did not want to use retail space for office space. Nunnick opined that the question was not whether the property could be used as a business park, just whether it was worth more redeveloped or as retail space. He also testified that he believed the Unified Government would "play ball" to rezone the property for retail; a zoning change was likely, depending on plans for redevelopment.

Nunnick testified that he valued the subject property as vacant land at $5 million. The cost method of valuation also led him to a value of $5 million, as did the comparable sales method. His analysis under the capitalization of income method led to a fair market value of $4.7 million.

The jury returned a verdict of $6.95 million.

## DISCUSSION

An eminent domain proceeding is statutory in nature. *Miller v. Bartle*, 283 Kan. 108, 114, 150 P.3d 1282 (2007). The only factual issue in dispute at the trial of a condemnation action is the fair market value of the property being taken by the government. *Miller*, 283 Kan. at 115 (citing K.S.A. 2005 Supp. 26-508).

K.S.A. 26-513(e) defines fair market value as:

"[T]he amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. The fair market value shall be determined by use of the comparable sales, cost or capitalization of income appraisal methods or any combination of such methods."

In *City of Wichita v. Eisenring*, 269 Kan. 767, 774, 7 P.3d 1248 (2000), this court noted that, before the legislature's addition of subsection (e) to K.S.A. 26-513 in 1999, the favored approach to valuation in Kansas was the market data approach, *i.e.*, a comparable sales method. Now the statute recognizes three methods— comparable sales, replacement cost, or income method—and permits any combination of the three to value the property taken. 269 Kan. at 775. "[A]ll three methods stand on equal footing," and this court no longer gives preference to one method. 269 Kan. at 775.

The district court " 'has broad discretion in determining what evidence will be allowed in an eminent domain proceeding.' " *Mooney v. City of Overland Park*, 283 Kan. 617, 619, 153 P.3d 1252 (2007) (citing *U.S.D. No. 464 v. Porter*, 234 Kan. 690, 694, 676 P.2d 84 [1984]).

" 'Generally, when considering a challenge to a district judge's admission of evidence, an appellate court must first consider relevance. Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. [Citation omitted].' " *Mooney*, 283 Kan. at 620 (quoting *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 [2006]).

The question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. See *State v. Reid*, 286 Kan. 494, 507-09, 186 P.3d 713 (2008).

" 'Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question.' " *Mooney*, 283 Kan. at 620 (quoting *Gunby*, 282 Kan. at 47). We must then consider whether the admitted evidence was unduly prejudicial, and our review on the prejudice question is for abuse of discretion. *Reid*, 286 Kan. at 512 (citing *Gunby*, 282 Kan. at 48-49).

Finally, under K.S.A. 60-261, no error in the admission of evidence is ground for granting a new trial or for setting aside a verdict unless refusal to take such action is inconsistent with substantial justice. This court must disregard any trial court error that does not affect the substantial rights of the parties. K.S.A. 60-261; *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011) (no reasonable probability error will affect outcome of trial). The burden of demonstrating K.S.A. 60-261 harmlessness for a nonconstitutional error is on the party benefitting from the error. See *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012).

*Admission of Kashani Opinion of Value During 2005 Tax Appeal*

KC Mall advances four arguments in support of its contention that the district judge erroneously admitted evidence of Kashani's opinion of value during the 2005 tax appeal: (1) Kashani filed the tax appeal for the specific purpose of enforcing the 10-year tax abatement, which means his opinion in the tax proceeding does not qualify as a previous inconsistent statement; (2) Kashani did not testify to value on direct examination and could not be impeached with his tax appeal opinion; (3) the appraisers used by KC Mall in this case were not involved in the 2005 tax appeal and were not subject to the rule permitting admission of prior inconsistent statements; and (4) the tax appeal was limited to four component parts of the subject property and thus admission of the Kashani values for those components violated the unit rule.

The essence of the Unified Government's response to all of these arguments can be stated succinctly: This issue is controlled by our decision in *Sealpak*, 279 Kan. at 799, which reconciled earlier competing rules and requires us to uphold the district court.

In *Sealpak*, property owner Sealpak Company, Inc., was subject to a 2002 taking. Sealpak's owner was Donald Smith. Condemnor City of Wichita wanted to admit evidence of a 2000 tax appeal Smith filed on behalf of the company, in which he opined that the property was worth $150,000. The district court excluded the evidence, ruling that evidence of tax assessments was inadmissible at trial and that necessary evidence of the difference in value between 2000 and 2002 was lacking.

During the city's proffer, Smith had testified that the county's valuation for the property had been $150,000 for several years leading up to 2000. In 2000, the county raised the appraised value for the property to $185,560. Smith's appeal form indicated that the "Value [was] over market value." Smith also testified that he believed the tax value should remain at $150,000 because of flooding the City had caused. At trial, Smith took the position that the property was worth $1,102,729. 279 Kan. at 800-01.

This court first recited the general principles that a landowner is competent to testify to the value of his or her property and that his or her opinion is relevant to the issue of value. 279 Kan. at 802. In addition, "out-of-court statements made by the owner which are inconsistent with his or her valuation position at trial are relevant and can be admissible as admissions against him or her." 279 Kan. at 802 (citing 5 Nichols on Eminent Domain § 18.12[1] [3d ed. 2003]; K.S.A. 2004 Supp. 60-460[g] [admissions by parties]; *Le Roy & W. Ry. Co. v. Butts*, 40 Kan. 159, 19 Pac. 625 [1888]).

We also recognized, however, that " 'assessed valuation of property for tax purposes is not admissible to establish the value of the property.' " 279 Kan. at 803 (quoting *Metee v. Urban Renewal Agency*, 213 Kan. 787, 789, 518 P.2d 555 [1974]). Part of the underlying rationale for this rule was that a tax valuation is prepared by a third party unavailable for cross-examination. *Love v. Common School District*, 192 Kan. 780, Syl. ¶ 1, 391 P.2d 152 (1964). An exception to this rule was identified in *Avery v. City of Lyons*, 181

Kan. 670, 673, 314 P.2d 307 (1957), which held that tax assessment documents were admissible in an eminent domain action because the value of the property was directly at issue and the documents had been signed and filed by one of the property owners.

We decided in *Sealpak*:

" ' "[A]n owner's valuation of his own property, or a valuation in which he has participated, for tax purposes, is usually held admissible in proceedings other than tax proceedings where the value of the property is in issue, in most instances on the ground that the owner's valuation constitutes an admission against interest, where he seeks to establish a higher value for a purpose other than taxation." ' " 279 Kan. at 805 (quoting *Avery v. City of Lyons*, 181 Kan. 670, 674, 314 P.2d 307 [1957] [citing 39 A.L.R.2d 209, p. 230]).

" 'Statements made by or *attributable to the owner* which are *inconsistent with his valuation position* at trial are admissible as admissions. They are thus considered exceptions to the hearsay rule of exclusion, and may be introduced by the condemning authority as *substantive evidence of value*.

. . . .

" 'Statements of the owner, which may become admissions . . . [include]

. . . .

" '(6) a statement made to the tax assessor that his property is not as valuable as the assessment.' " (Emphasis added.) 279 Kan. at 805 (quoting 5 Nichols on Eminent Domain § 18.12[1] [3d ed. 2003]).

We specifically rejected a simplistic rule of exclusion from *Metee v. Urban Renewal Agency*, 213 Kan. 787, 518 P.2d 555 (1974), or *Love v. Common School District*, 192 Kan. 780, 391 P.2d 152 (1964), to the facts of *Sealpak*, in which the valuations at issue were not made by third parties unavailable for cross-examination. 279 Kan. at 805. We also recognized that, because an owner's prior statement related to a tax appeal could come into evidence as an admission against interest, the owner would have the right in an eminent domain action to offer an explanation for the value he or she placed on the property in a tax proceeding. 279 Kan. at 807.

Most of the particulars of this case are not meaningfully distinguishable from those before us in *Sealpak*. Like Smith for Sealpak, Kashani is the representative of his company, KC Mall. His statements on behalf of KC Mall in the tax appeal, like Smith's on behalf of Sealpak, were attributable to the company. They were not statements of a third-party taxing authority, and Kashani was available

at trial of this eminent domain proceeding for explanation and cross-examination.

We also note that there is a further fact in this case not present in *Sealpak*, and it favors admission of Kashani's representations during the tax appeal: the taxing authority and the condemning authority are one and the same, the Unified Government. This fact ameliorates any concern over surprise or confusion that may arise when the taxing and condemning authorities are two different governmental bodies. Compare *Metee*, 213 Kan. at 788-89.

*Sealpak* also tells us that a landowner's admissions against interest are admissible as substantive evidence in the eminent domain proceeding, regardless of whether the landowner testifies live about value. *Sealpak*, 279 Kan. at 805. Nichols on Eminent Domain supports this proposition:

"Statements made by or attributable to the owner which are inconsistent with his valuation position at trial are admissible as admissions. They are thus considered exceptions to the hearsay rule of exclusion, and may be introduced by the condemning authority as substantive evidence of value.

. . . .

"As with any nonjudicial admission, an admission against interest by the owner is not conclusive but, rather, constitutes substantive evidence of value. This being the case, the owner is free to introduce evidence in explanation of the circumstances attending the admission or its adoption. In addition to serving as substantive evidence of value, the owner's admissions may be tendered for impeachment purposes should the owner testify on the issue of valuation." 5 Nichols on Eminent Domain § 18.12[1], pp. 18-75, 18-87 (3d ed. 2009).

The Kansas hearsay statute is likewise in harmony:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

"(g) *Admissions of parties.* As against a party, a statement by the person who is the party to the action in the person's individual or representative capacity and, if the latter, who was acting in such representative capacity in making the statement." K.S.A. 60-460(g).

Our discussion of *Sealpak* demonstrates its foreclosure of the first three of KC Mall's four arguments.

Specifically, KC Mall's first argument—that the tax appeal was filed only to enforce the 10-year tax freeze—goes to the weight of

the evidence, not its admissibility. It is merely Kashani's explanation for why he filed the tax appeal, and he was afforded the opportunity to explain his rationale to the jury. This is all that *Sealpak* requires. *Sealpak*, 279 Kan. at 807.

KC Mall's second and third arguments are in conflict with *Sealpak*'s recognition that Kashani's statements in the tax appeal were admissible as substantive evidence as well as impeachment. See 279 Kan. at 805. It was not necessary that Kashani personally take a position on value at the eminent domain trial. It would have been enough that the landowner sponsored testimony of a valuation expert with an opinion different from that expressed by Kashani in the 2005 tax appeal. The tax appeal evidence was relevant to—both material to and probative of—the fair market value of the subject property. See *State v. Magallanez*, 290 Kan. 906, 920-21, 235 P.3d 460 (2010) (materiality concerns whether fact to be proved has legitimate and effective bearing on decision of case; probativeness concerns whether offered evidence has any tendency in reason to prove disputed material fact). For these reasons, we hold that the 2005 tax appeal evidence was admissible for purposes of impeachment as well as substantive evidence.

Beyond *Sealpak*, we also must reject KC Mall's fourth argument that admission of the evidence of Kashani's position on four parcels in the tax appeal violated the unit rule. The rule requires that the total value of condemned real estate be determined and limits consideration of the value of buildings and improvements to the extent they enhance the value of the land taken. *Creason v. Unified Government of Wyandotte County*, 272 Kan. 482, 485-86, 33 P.3d 850 (2001) (citing *Ellis v. City of Kansas City*, 225 Kan. 168, 171, 589 P.2d 552 [1979]). It stands in contrast to a "summation method" of appraisal, rejected in Kansas, under which contributing items of real estate and improvements are added up for a total value. *Creason*, 272 Kan. at 486 (citing *City of Manhattan v. Kent*, 228 Kan. 513, 518, 618 P.2d 1180 [1980]). In other words,

"an award of compensation must reflect the value of the property as a whole. *There is an important distinction between the measure of value and the evidence admissible to prove it.* The award of just compensation cannot assign separate values to component parts of the property. In other words, one value cannot be

given to the land, another value to the water rights, and another [value] to the mineral rights. However, to demonstrate how the value of the property as a whole is enhanced by a natural asset, evidence can be introduced of its separate value." (Emphasis added.) *Creason*, 272 Kan. at 490.

Here, the four parcels that were the subject of the 2005 tax appeal include the main mall structure, the former Dillard's building, the former Franklin Bank building, and the former Brotherhood Bank building. At trial, the Unified Government specifically reviewed the individual values Kashani assigned each of the four parcels subject to the tax appeal. And Kashani acknowledged those values added up to $2.65 million.

While it may superficially appear that the Unified Government added up the Kashani-assigned values of separate parcels to arrive at a total value, that total was not the fair market value of the subject property for which the Unified Government advocated. The range for fair market value that it encouraged was the $3.7 million to $5 million supported by its two appraisal experts, Marx and Nunnick. The Unified Government merely used the $2.65 million total of Kashani's tax appeal values to cast doubt on Kashani's assertion at trial that the whole of the subject property was worth $30 to $35 million. This use of the $2.65 million did not violate the unit rule.

For all of the reasons discussed above, we reject KC Mall's appellate challenge to Judge Sieve's admission of evidence regarding Kashani's valuations from the 2005 tax appeal. Kashani's statements were admissible as both substantive and impeachment evidence because they qualified as admissions against interest of his company, KC Mall.

*Admission of Unified Government's Experts' Appraisal Reports and Testimony*

At trial, KC Mall objected to Marx's testimony, arguing that the subject property was zoned as a business park rather than as a mall at the time of the taking and that Marx should have used data from business parks rather than malls in transition to other uses. Judge Sieve permitted KC Mall to voir dire Marx outside the jury's presence on the issue but overruled the objection, reasoning that KC

Mall's argument went to the weight rather than admissibility of Marx's opinions. KC Mall also lodged the same objection to Nunnick's testimony, but Judge Sieve again overruled it, stating that Nunnick's methods were within accepted limits for valuation experts.

KC Mall renews its argument on appeal that the Unified Government's experts' appraisal reports and testimony were inadmissible because the witnesses compared the subject property to retail malls, even though it was zoned at the time of the taking as a business park. The Unified Government responds that the property had not been altered physically since its days as a shopping mall, with the exception of updated signage, which made its experts' methods appropriate.

In ruling on KC Mall's objections at trial, Judge Sieve reviewed our decision in *Board of Johnson County Comm'rs v. Smith*, 280 Kan. 588, 123 P.3d 1271 (2005). On this appeal, KC Mall argues that *Smith* stands for the proposition that any appraisal presuming a use inconsistent with zoning leads to an erroneous determination of highest and best use and that employment of comparable data based on an incorrect highest and best use is legally flawed. We disagree with KC Mall's interpretation of our *Smith* opinion.

In *Smith*, the parties asked this court to determine the subject property's zoning classification because that would "largely determine the just compensation." 280 Kan. at 596. We first observed that the zoning classification of the subject property was *not* dispositive of the issue of value: " '[I]n determining, for condemnation purposes, the most profitable use to which land can reasonably be put in the reasonably near future, the existing zoning restrictions or other restrictions should be considered, *but they are not determinative.'* (Emphasis added.) 29A C.J.S., Eminent Domain § 148(d)." 280 Kan. at 597.

We noted the consistency between this language and K.S.A. 26-513(d)(1), which sets out 15 nonexclusive factors to be used to ascertain the proper amount of compensation in an eminent domain proceeding. See *Smith*, 280 Kan. at 596. Those factors include:

"(1) The most advantageous use to which the property is reasonably adaptable.

. . . .

"(4) Productivity, convenience, use to be made of the property taken, or use of the property remaining.

. . . .

"(9) Destruction of a legal nonconforming use.

. . . .

"(13) That the property could be or had been adapted to a use which was profitably carried on." K.S.A. 26-513(d).

*Smith* recognized that PIK Civ. 3d 131.05 addressed the first of these factors (the most advantageous use to which the property is reasonably adaptable) and stated:

" 'In determining fair market value, you should consider *all of the possible uses to which the property could have been put*, including the best and most advantageous use *to which the property was reasonably adaptable*, but your consideration must not be speculative, conjectural, or remote. *The uses which may be considered must have been so reasonably probable as to have had an effect on the fair market value of the property at the time of the taking.'* (Emphasis added.)" 280 Kan. at 597 (quoting PIK Civ. 3d 131.05).

We then went on to recognize that a determination of the uses to which a property was reasonably adaptable included consideration of a reasonable probability of zoning changes. 280 Kan. at 597. This court looked to 5 Nichols on Eminent Domain § 18.05[3] (3d ed. 2003):

" 'Admissibility of a proposed use requires a showing that the property is both physically adaptable for that use and that there is a demand for such use in the reasonably near future. *Even if the asserted use is prohibited by zoning or other land use designations or requires the issuance of governmental permits, evidence of such use is admissible upon a showing that it is reasonably probable that the zoning or other designations would be changed or that permits would be issued.'* (Emphasis added.)" 280 Kan. at 597.

Finally, we observed that the issue of rezoning probability was a jury question, as evidenced by PIK Civ. 3d 131.06:

" 'If you find that the best use to which the land could have been put at the time of the taking was a use other than that for which it was zoned at the time, *and that there was a reasonable probability of its being later rezoned to permit such use*, then you may consider such use in determining the market value.' (Emphasis added.)" 280 Kan. at 597 (quoting PIK Civ. 3d 131.06).

The concept of "best and most advantageous use" or "highest and best use" is a factor for the jury to consider when awarding just compensation. See K.S.A. 26-513(d); PIK Civ. 4th 131.05. "The essential inquiry must be: what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted." 4 Nichols on Eminent Domain §12B.12, p.12B-96 (3d. ed. 2011).

The crucial question arising from our interpretation of *Smith* is whether there was any evidence presented to the jury about the probability of rezoning. We see some evidence in the record before us to support an inference that rezoning was reasonably probable, given the state of the property and its current use. At the time of the taking, none of the buildings on the subject property had been altered to conform to business park use. Although architects had been hired to draw plans for an office park, the plans had not yet been pursued. The tenants occupying the buildings after rezoning as a business park were the same tenants that occupied the buildings before that rezoning. Nunnick also testified that he believed the Unified Government would "play ball" with a retail redevelopment plan. Finally, Marx testified that a change in zoning would not alter demand.

Given this evidence and *Smith*'s holding that zoning is but one factor to consider in determining highest and best use, the district court did not err by admitting the testimony and reports of the Unified Government's expert appraisers.

## CONCLUSION

Because Kashani's statements in the 2005 tax appeal were admissible both substantively and for impeachment as admissions against interest of his company, KC Mall, and because zoning at the time of a taking is only one of the factors to be considered in determining highest and best use of a property subject to eminent domain, we see no reversible error in this proceeding. The judgment of the district court is, therefore, affirmed.